[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-10441

_____

APRIL M. MYRICK,
as guardian of Za'Kobe K. Rickerson, a minor
as guardian of Jordan I. Rickerson, a minor,
SHEENA PETTIGREW,
Mother and Natural Guardian
of Elijah Pettigrew, a minor,
THE ESTATE OF ANTONIO DEVON MAY,
by and through his Administrator April M. Myrick,

Plaintiffs-Appellants,

*versus*

FULTON COUNTY, GEORGIA,
SHERIFF THEORDORE JACKSON,
in his individual capacity,
SHERIFF OF FULTON COUNTY, GEORGIA,

in his official capacity,
SERGEANT JOHN DOE,
in his official and individual capacities,
JOHN DOE DEPUTIES, individually,
NAPHCARE, INC., et al.,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:19-cv-02440-TWT

_____

Before NEWSOM, LUCK, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

This appeal arises from the tragic death of Antonio May on September 11, 2018. April Myrick, Sheena Pettigrew, and the Estate of Antonio May (collectively the "Appellants") appeal the District Court's orders dismissing their claims against Sheriff Theodore Jackson and granting summary judgment to the Fulton County Sheriff's Department Officers, NaphCare, and NaphCare employee Travis Williams. After careful review of the record (including the portions of the incident captured on video), and with the benefit of oral argument, we affirm the District Court's dismissal of the claims against Sheriff Jackson, and its grant of summary

judgment to both the Officers and Williams.  Because the District Court erred in granting NaphCare summary judgment, however, we vacate the District Court's summary judgment in favor of NaphCare and remand the case against NaphCare for further proceedings.

## I.

### A.

The Atlanta Police Department (the "APD") responded to a criminal trespass call at the American Cancer Society building in downtown Atlanta very early in the morning on September 11, 2018.  A male subject had thrown multiple rocks at the building, shattering one of the glass windows.  Upon their arrival, APD officers heard a male voice yelling and noticed a male subject laying on the ground with his arms spread out.  APD officers identified the subject as Antonio May, and building security informed APD that May threw the rocks at the building.  May told the APD officers that he wanted to go to jail and indicated that he was not feeling well; the APD officers took May to Grady Hospital to be examined.

Grady Hospital records show that May arrived around 5:30 AM and stated that he felt paranoid and thought someone was chasing him.  He also admitted to smoking methamphetamine that night but refused lab work.  The Grady Hospital records note that May had a history of meth use and that he was also restless, was picking at his skin, and had hyper-verbal speech.  In addition to using methamphetamine, May admitted to consuming a large 22-ounce beer that morning.  May told hospital employees that he felt

like he was having a mental breakdown and that he had been trying to get the police to help him because of his paranoia, but that they arrested him instead. May further indicated that he had been using methamphetamine for several years, but claimed his problem was not methamphetamine, but rather his mental breakdown. Finally, the records indicate that May denied suicidal ideation, homicidal ideation, audio or visual hallucinations, and prior psychological hospitalizations. The hospital, on the recommendation of a psychiatrist, released May to be transported to the Fulton County Jail, as that structured environment was "likely to be of the most benefit for him given his current meth intoxication." They also stated that May was "safe for discharge from a psychiatric perspective."

*B.*

May arrived at the Fulton County Jail around 9:00 AM on the morning of September 11, 2018. As a brief overview, the Fulton County Jail contracts with NaphCare to provide all medical services to the inmates at the jail. When an inmate arrives at the Fulton County Jail, he is initially strip searched. He then goes to triage, where a nurse or paramedic does a very brief intake screening prior to taking custody of the inmate. The inmate then goes through the booking process, after which the medical department performs a full medical screening, or receiving screening, before the medical provider at the jail determines where to house the inmate.

If the inmate expresses feelings of suicide or self-harm during the intake examination, a mental health professional typically evaluates him as soon as possible, and makes sure that he is

22-10441                Opinion of the Court                5

observed and isolated so that he is not a danger to himself or others. The medical provider on duty makes the final decisions regarding detox procedures if an inmate indicates that he is on drugs or the intake nurse or paramedic suspects that is the case.[1]  On the day that May was taken to Fulton County Jail, the provider on duty was David Didier.

EMT Travis Williams conducted May's intake screening.[2] When Williams asked him if he was suicidal, May indicated that he was, but that he did not have a plan to harm himself.  Williams also stated that the arresting officer gave him paperwork from Grady Hospital indicating doctors diagnosed May as having methadone use disorder.[3]  On the intake screening form, Williams noted that May was actively or suspected to be detoxing and that May had current suicidal thoughts, but that he had no current plan regarding those thoughts.

When the intake screening is done, the nurse or paramedic places the screening form in a dedicated place for the provider to find, and the inmate moves to the booking process.  If the intake

---

[1] The medical provider—an employee of NaphCare and not the Fulton County Jail—is typically a nurse practitioner or physician's assistant in charge of overseeing NaphCare's provision of medical services.

[2] Travis Williams was an employee of NaphCare, as was medical provider David Didier.

[3] The same records also indicate that May was diagnosed with substance-induced psychotic disorder.

screening reveals anything abnormal, the intake nurse or paramedic reviews it with the provider. At his deposition, Williams stated that after completing the intake screening, he took the form to let the provider know about May's suicidal ideations and potential drug use. On the way, Williams stated that he stopped at the booking desk and told them that May had thoughts of suicide and self-harm.[4] He then testified that he told the medical provider on duty, Didier, that May had come in from Grady with methadone use disorder and substance-induced psychotic disorder, that he voiced thoughts of suicide, and that he was possibly detoxing.[5]

After Williams concluded May's intake screening, the record reveals little about what happened to May. The intake screening took place around 9:00 AM, and then May was sent to booking. Before booking could be concluded and May could be dressed out and housed elsewhere in the jail, he needed to have a full medical screening, also known as a receiving screening. Sergeant Myron Bush, the intake supervisor from 7 AM–3 PM on September 11, reported that, at some time during the booking process, May displayed erratic behavior and signs of mental illness, claiming that people were watching him. Bush made the decision to place May in holding cell 172 because it was near medical and medical would

[4] Williams did not remember who he spoke with at the booking desk. Regardless, it is undisputed that, whomever he told, that information was never passed along to the other Fulton County Jail officers working that day.

[5] According to Didier's deposition testimony, he does not recall Williams informing him that May was suicidal and detoxing.

be able to observe May. The record shows that May was placed in the holding cell by noon at the latest. Bush also reported that May beat on the glass on the door of the holding cell a few times throughout the day and took several minutes to comply with commands. Bush decided to "fast track" May and get him through medical screening as quickly as possible. He informed Sergeant Jamillah Saadiq, the incoming intake supervisor, that May was to be fast tracked. Lieutenant Derrick Paige, Direct Action Response Team ("DART") commander and unit manager over the intake area on September 11, 2018, also recalled that prior to May's altercation with the Officers, he observed May being combative and banging on the glass on the door to the holding cell. Paige instructed May to put his shirt back on, and May complied, but he continued to yell and curse at everyone and bang on the door as people walked by.

NaphCare records show that May's vitals were taken at 10:46 AM, and that someone attempted to take his vitals at 3:29 PM, but that attempt was not successful. Those records also show that NaphCare ran a drug screening test on May, and that, at the latest, the results of that test were available by 12:55 PM on September 11, 2018.[6] The results show that May was positive for

---

[6] The lab report indicates that the results were last updated at 11:55 AM CDT. This would be 12:55 PM Eastern time, which is the time zone in Atlanta. This does not indicate when the results were *first* available, but it does show that by 1 PM at the latest—hours before the incident at issue here—NaphCare knew or should have known that May tested positive for drugs.

8                    Opinion of the Court                    22-10441

amphetamines, ecstasy, and methamphetamine.  The record does not indicate that May was ever treated for the drugs or that his suicidal thoughts were monitored while he was in the holding cell. The parties do not dispute the point that none of the officers involved were aware that May was suicidal or potentially detoxing.

*C.*

Sergeant Jamillah Saadiq, the intake supervisor on the afternoon of September 11, 2018, first encountered May when she walked through the intake area and saw him naked in the holding cell.[7]  She asked May to put his clothes on and went to get assistance to see if they could get May's clothes on and get him through the rest of the intake process.

She requested assistance from DART Officer Aaron Cook.[8] Cook, along with Officers Omar Jackson and Jamel Goodwine, arrived and noticed May naked and masturbating in the cell[9]—in

---

[7] She worked the 3 PM–11 PM shift and took over from Sergeant Myron Bush, who was the intake supervisor for the previous shift.

[8] Direct Action Response Team, or DART, members were solely assigned to DART and were not stationed at any specific location within the Fulton County Jail.  Instead, they provided facility patrol, removed contraband from inmates' cells during shakedowns, assisted with floor operations when needed, responded to emergencies, and engaged inmates if an inmate became combative.  DART members received additional training, such as tactical school, beyond what a floor officer normally received.

[9] Officers Jackson and Goodwine did not recall seeing May masturbating, but did recall seeing him naked in the cell.

violation of both jail policy and state law. Cook instructed May to get dressed. Cook then asked for the door to cell 172 to be opened while he continued to give loud verbal commands to May to back up and then get face down on the ground. May responded by saying something along the lines of "I ain't doing that shit," and took an aggressive stance—clenched fists and separated feet—in front of the cell door. At this point, Cook removed his county-issued taser and gave another loud verbal command to get on the ground; May still did not comply. May, still in an aggressive stance, then stepped toward Officer Cook.[10] All three officers testified that, at that moment, they believed May represented a threat to them. Cook then deployed his taser, striking May in the back.[11] May fell to the ground, but almost immediately got back up and charged at the officers while screaming, kicking, and punching. Cook twice attempted to send another charge through the taser to incapacitate May but, according to the taser logs, these additional attempts had no potential for effectiveness.

By now, other officers had joined to help get May under control. Officer Jackson, assisted by Officers Goodwine and Jason

---

[10] Appellants argue that the Officers' testimony that May stepped toward Cook is not credible and that the Officers' depositions contradict the statements they gave immediately after the incident. We address this argument *infra* part III.A.1.

[11] The taser log shows that Cook's taser was deployed at 3:49.22 PM and that the charge was partially successful for the first two seconds, but then the connection was lost.

Roache, attempted to restrain May's legs, but May continued to kick. To gain compliance, Officer Jackson stunned May's left leg with his taser, which allowed him to cross May's legs at the ankles.[12] Officer William Whitaker observed May kicking at the other officers and, believing him to be an immediate threat, deployed his taser; the taser had no effect on May.[13] Officer Whitaker attempted to drive stun May with his taser three times; these attempts may have been successful.[14] Believing the stuns to be ineffective, and because May was still being combative, refusing to get down, and trying to exit the cell, Whitaker pepper-sprayed May in the face.

After Officer Whitaker deployed the pepper spray, Officer Roache took May to the ground using a tactical maneuver. With the help of Officers Cook, Jackson, and Goodwine, Officer Roache successfully placed leg irons on May.[15] May continued to punch at Officer Roache. Officer Kenesia Strowder, who noticed her teammates struggling with May while she conducted crowd control, stepped in to help and attempted to handcuff May. May continued

---

[12] The taser log shows that Jackson's taser was used to stun May at 3:50.11 PM.

[13] According to the log, Officer Whitaker deployed his taser at 3:50.18 PM.

[14] Of the three attempts to stun May, the taser log indicates that the first had no potential for effectiveness. The second and third attempts to stun May might have been successful.

[15] This was the only time Officer Goodwine made contact with May.

to resist and grabbed Strowder's handcuffs; Strowder gave May verbal commands to drop the cuffs. When May did not comply, Strowder struck him with a closed fist four times—once in each of the face, arm, hand, and back. Officer Jermaine Copeland then applied handcuffs to May. The handcuffs were transferred to waist chains as May continued to kick his legs. Officer Guito Delacruz put a spit mask over May's face after seeing him spit.

With May restrained, Officers Cook, Jackson, Whitaker, and Roache placed May in a restraint chair[16] and moved him to the showers for decontamination, as is protocol after using pepper spray.[17] The Officers placed May in the restraint chair with the following restraints applied: handcuffs, waist chain, leg restraints, and the shoulder straps from the chair itself. May continued his aggressive and combative behavior. The Officers removed May's spit mask and decontaminated his face with cool water from a hose.

---

[16] There is much debate in this case as to whether the chair used to transport May from the holding cell to the shower and then to the property room was a restraint chair or a transport chair. The difference in the type of chair used is not relevant for purposes of this appeal. For consistency, we refer to it as a restraint chair because this case comes to us on a motion for summary judgment, and Appellants classified it as a restraint chair.

[17] According to their depositions, Officers Copeland, Goodwine, and Delacruz never touched the restraint chair. Following the incident, Officers Cook, Jackson, Whitaker, Roache, and Delacruz, as well as Lieutenant Derrick Paige, were disciplined for improperly applying the restraint chair's wrist restraints and failing to remove the waist chain and leg irons in a timely manner; the Officers testified during the Fulton County Sheriff's Office of Professional Services investigation that they used a transport chair and not a restraint chair.

After they removed the leg restraints, the Officers attempted to dress May, who continued to kick and resist. As they attempted to dress May, Officers Whitaker and Roache each delivered one closed-hand strike to May's legs to gain compliance. Once they dressed May, the Officers reapplied his restraints, including the spit mask, and Officer Whitaker wheeled May into the property room for examination by the medical staff.

Officer Cook left the property room to get Didier, the medical provider, who was required to perform an evaluation after a use of force incident. Shortly thereafter, Didier arrived in the property room. Didier conducted a visual evaluation of May, who was awake and not in distress. Didier then left the area to gather equipment. As Didier performed his assessment, DART Commander and Intake Unit Manager Lieutenant Derrick Page arrived. Because May no longer appeared to be resisting, Lieutenant Paige instructed the officers to remove the handcuffs and place May's hands in the chair restraints, which they began to do.

At some point the officers realized May had become unresponsive. Approximately fifteen seconds after Didier left, Officer Whitaker lifted May's spit mask. May's legs and head moved at that time. Approximately ten seconds later, Whitaker rocked the chair up and down slightly; May did not move. Approximately ten seconds after that, Whitaker dropped the chair into resting position, which jolted May but did not cause any reaction. The officers began to look at May and touch him, but May did not respond. Lieutenant Paige directed the officers to get May out of the chair

and start lifesaving measures.  The officers began to remove May's restraints and move him to the floor, which took about two minutes.  During this time, May remained unresponsive in the chair.

Officer Roache gave May chest compressions while Officer Copeland performed rescue breathing.  For about the next half hour, various officers, medical staff, and Atlanta Fire Department personnel—who arrived on scene approximately 15 minutes after May became unresponsive—attempted to resuscitate May, who died on the floor of the property room.  According to the medical examiner's report, May died of sudden cardiovascular collapse due to probable excited delirium with physical restraint use and acute methamphetamine intoxication; the manner of death is listed as undetermined.

*D.*

On May 29, 2019, Appellants[18] brought this lawsuit in the United States District Court for the Northern District of Georgia alleging the following claims, all stemming from May's death:

1.  Excessive force and deliberate indifference claims under 42 U.S.C. § 1983 against Jason Roache, Derrick Paige, Jamel Goodwine, William Whitaker, Aaron Cook, Omar Jackson,

---

[18] Appellants are May's estate; April Myrick, the legal guardian and grandmother of two of May's children, Za'Kobe and Jordan Rickerson; and Sheena Pettigrew, the mother and natural guardian of Elijah Warren, another of May's children.

Jermaine Copeland, Kenesia Strowder, and Guito Delacruz (collectively, the "Officers");[19]

2. Supervisory liability under 42 U.S.C. § 1983 against Fulton County, Georgia and Sheriff Theodore Jackson for unconstitutional policies that led to May's death;[20]

3. Common law and statutory failure to warn claims against Axon Enterprise;[21]

4. Discrimination under the Americans with Disabilities Act (the "ADA") and Rehabilitation Act against Sheriff Jackson in his official capacity and against Fulton County, Georgia;[22]

---

[19] Jasmine Rowe, Jamillah Saadiq, Mary Stovall, and Jordan Wilcher were originally listed as defendants on the excessive force and deliberate indifference claims, but the parties jointly stipulated to dismiss all claims against those officers under Federal Rule of Civil Procedure 41(a)(1)(A)(ii). Appellants moved the District Court to add Myron Bush as a defendant to the excessive force and deliberate indifference claims, but the District Court denied that request.

[20] Fulton County moved the District Court to dismiss all the claims against it. The District Court granted that motion. Appellants do not appeal the dismissal of claims as to Fulton County, so that claim is not before this Court on appeal.

[21] The parties stipulated to the dismissal of all claims against Axon Enterprise, Inc. pursuant to Rule 41(a)(1)(A)(ii).

[22] Appellants do not reference their ADA or Rehabilitation Act claims in their appeal, so this issue is not properly before this Court. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("[A] legal claim or

5. Medical negligence under Georgia law against NaphCare, Inc. and paramedic Travis Williams.[23]

Sheriff Jackson moved the District Court to dismiss the claims against him. The District Court granted that motion. Specifically, the Court found that, as an arm of the State, Sheriff Jackson was not a person within the meaning of § 1983. As such, the Court held that it lacked jurisdiction to entertain the § 1983 claims against Sheriff Jackson (in his official capacity) because he was entitled to Eleventh Amendment immunity. With respect to Sheriff Jackson in his individual capacity, the District Court held that he was entitled to qualified immunity on the § 1983 claims of supervisory liability based on a failure to train and inadequate policies because Appellants (1) failed to demonstrate that qualified immunity was not appropriate on the failure to train claims; (2) did not plausibly allege a history of widespread abuse that would have placed Sheriff Jackson on notice of a need for correction; (3) had not plausibly alleged that a causal connection existed between Sheriff Jackson and the alleged constitutional violation; (4) had not plausibly pleaded that the Sheriff directed the deputies to act unlawfully or knew that they would do so and failed to stop them; and (5) had not shown that it was clearly established that the Sheriff had an obligation to disregard the medical expertise of the contractors he

---

argument that has not been briefed before this court is deemed abandoned and its merits will not be addressed.").

[23] Appellants moved the District Court to add David Didier as a defendant to the medical negligence claim. The Court also denied that request.

hired to provide healthcare. The District Court dismissed the ADA and Rehabilitation Act claims because Appellants did not successfully allege that Sheriff Jackson (or any Fulton County Jail employee) was aware of May's disability, so he could not have discriminated against him based on that disability.

Following discovery, the Fulton County Officers moved the District Court for summary judgment on the claims against them. The District Court granted that motion on qualified immunity grounds. The Court held that, under the objective reasonableness standard, the Officers did not subject May to objectively unreasonable force. May violated both jail policy and state law, refused to put on his clothes, and ignored instructions. Once May stepped towards Officer Cook, Cook deployed his taser. This was a reasonable amount of force in the Court's view. According to the Court, "the crucial fact underlying this analysis is May's step toward the Officers. . . . This step . . . indicates that a reasonable officer under the same circumstances could have determined that May represented a safety or flight risk." Order, Doc. 240 at 17.

The District Court similarly found all of the following to be objectively reasonable uses of force, given May's continued resistance to the Officers and noncompliance with their commands: the subsequent taser deployments; Officer Whitaker's use of the pepper spray; Officer Roache's takedown of May; Officer Strowder's closed-fist strikes; Officer Delacruz's use of a spit mask; and the use of a restraint chair with additional restraints by Officers

Paige, Delacruz, Whitaker, Roache, and Jackson.[24]   The District Court also found that Appellants had not provided specific case law that would indicate that the alleged constitutional violations were clearly established, instead painting the collective use of force by all Officers as collectively unreasonable.  According to the Court, the actions of the Officers "do not represent such shocking conduct that their unconstitutionality can be inferred by anything less than clear precedent."  Order, Doc. 240 at 24.  The Officers were thus entitled to qualified immunity on the excessive force claim.

The District Court also granted the Officers summary judgment on the deliberate indifference claim.  Even if Appellants had successfully met the first element of such a claim—showing a substantial risk of serious harm—the Court held that they did not show a genuine issue of material fact as to the second—deliberate indifference to that risk.  This was because the video footage "dispels any notion that the Officer Defendants responded unreasonably to May's conditions." *Id.* at 26.  Because the Officers got May medical assistance and reacted when he became unconscious, Appellants failed to show that the Officers were deliberately indifferent.

Like the Officers, NaphCare and Travis Williams jointly moved the District Court for summary judgment as to the medical negligence claims against them.  As it did with the Officers, the

---

[24] On appeal, Appellants make arguments regarding only three of these alleged uses of excessive force:  Officer Cook's use of the taser, Officer Strowder's closed-fist strikes, and the use of illegal restraints by Officers Delacruz, Cook, Whitaker, Roache, and Jackson.

District Court granted their motion. The District Court focused the bulk of its order on the third element of a medical malpractice claim under Georgia law—proximate cause. Importantly, the Court noted: "Both of the experts concede in their conclusions that an intervening event—May's altercation with the Officer Defendants—occurred between the actions of the NaphCare Defendants and May's death." *Id.* at 30. According to the Court, "too many actions and choices made by May and the Officers [stood] in between the decisions of the NaphCare Defendants and May's death to deem their failure to sedate May the proximate cause of the events." *Id.*

## E.

In their timely appeal, Appellants largely reassert the same arguments as below. They argue that Sheriff Jackson is not entitled to Eleventh Amendment immunity in his official capacity, that he is a person within the meaning of § 1983, that he is not entitled to qualified immunity in his individual capacity, and that he can be held liable under a supervisory liability theory in both his official and individual capacities. They further argue that Williams and NaphCare are not entitled to summary judgment because they have shown proximate cause between May's death and the lack of medical care he received, as required by Georgia law. Finally, Appellants argue that the Officers are not entitled to summary judgment on the excessive force and deliberate indifference claims because (1) the amount of force used on May was not objectively reasonable; (2) the Officers' depositions are not credible; and (3) none

of the Officers rendered first aid, offered to assist, or took May directly to receive medical care.  We address each of these claims in turn.

## II.

To begin, we address Appellants' argument that the District Court erred in granting Sheriff Jackson's motion to dismiss.  We review a district court's ruling on a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) *de novo*.  *Smith v. United States*, 7 F.4th 963, 973 (11th Cir. 2021).  Likewise, we review a district court's grant of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) *de novo*.  *McGroarty v. Swearingen*, 977 F.3d 1302, 1306 (11th Cir. 2020).  We accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Id*.  We may dismiss a complaint pursuant to Rule 12(b)(6) on a dispositive issue of law.  *Patel v. Specialized Loan Servicing, LLC.*, 904 F.3d 1314, 1321 (11th Cir. 2018) (citing *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.3d 1171, 1174 (11th Cir. 1993)).

### A.

"An assertion of Eleventh Amendment immunity essentially challenges a court's subject matter jurisdiction." *Seaborn v. Fla. Dep't of Corrs.*, 143 F.3d 1405, 1407 (11th Cir. 1998).  The Eleventh Amendment bars suit against a state by its own citizens and by citizens of another state—even if the state is not a named party to the action. *Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S. Ct. 1347, 1355

(1974). The law is "well-settled that Eleventh Amendment immunity bars suits brought in federal court when the State itself is sued and when an 'arm of the [s]tate' is sued." *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc) (internal citation omitted). Whether Sheriff Jackson is entitled to Eleventh Amendment immunity thus turns on whether he was acting as an arm of the state, which in turn depends on "the particular function in which [he] was engaged when taking the actions out of which liability is asserted to arise." *Id.* Taken together, the Appellants' allegations point to Sheriff Jackson engaging in the following "particular functions": creating and implementing force policy; hiring, training, and disciplining officers; and providing medical care to detainees.

We consider four factors in determining whether an entity is an "arm of the state": (1) how state law defines the entity; (2) what degree of control the state maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity. *Id.* at 1309. Whether Sheriff Jackson is an "arm of the state" for Eleventh Amendment purposes is a question of federal law, but that federal question can only be answered by considering provisions of state law. *Id.*

1.

Our seminal case on whether a defendant is an "arm of the state" for Eleventh Amendment immunity purposes, *Manders v. Lee*, also deals with a county sheriff in Georgia. It also addresses the sheriff's "force policy at the jail and the training and disciplining of his deputies in that regard." *Manders*, 338 F.3d at 1307–09. As

such, with respect to the first two "particular functions" Sheriff Jackson allegedly performed—implementing force policy and training and disciplining his officers—we need only look to *Manders* because it deals with the law of the same state, the same type of actor, and the same specific functions. Under *Manders*, Sheriff Jackson acted as an arm of the state with respect to his force policy and training and disciplining his officers, and he is entitled to Eleventh Amendment immunity. *See id.* at 1328.

In *Manders*, we held that because, under state law, "the sheriff wears a 'state hat' when he creates and implements force policy in the jail," the first factor weighed heavily in favor of immunity. *Id.* at 1319. We also found that, as to the second factor, "only the State possesses control over sheriffs' force policy and that control is direct and significant in many areas, including training and discipline." *Id.* at 1320. The counties, on the other hand, have no authority or control over force policy. *Id.* at 1322. The third factor—who funds the entity—also tilted in favor of immunity. Though the county bore the major burden of funding sheriffs' offices and jails, it did so because of a state mandate. *Id.* at 1323. Ultimately, "[p]ayment of Sheriff [Jackson's] budget, when required by the State, does not establish any control by [Fulton] County over his force policy at the jail or how he trains and disciplines his [officers]." *Id.* at 1324. As far as who is responsible for paying judgments against the entity, under Georgia law, neither the State nor the county were required to pay an adverse judgment against the sheriff—but the funds of both were implicated by such a judgment. *Id.* at 1329. We did not hold that this final factor pointed towards

immunity, saying only that "[a]t a minimum, this final factor does not defeat [it]." *Id.*

In sum, Sheriff Jackson acted as an "arm of the state" with respect to force policy and training and disciplining officers. He is entitled to Eleventh Amendment immunity.

2.

The other specific function Sheriff Jackson performed was providing medical care. *Manders* does not speak directly to whether Sheriff Jackson acted as an "arm of the state" with respect to the provision of medical care, but its discussion of the structure of the sheriff's office, generally speaking, is still instructive. The State still controls, trains, and disciplines the sheriff's office. Our discussion of the third and fourth *Manders* factors apply with equal force here. The third factor tilts in favor of immunity because some state money goes to the sheriff's office, and a state mandate requires the county to fund the sheriff's budget but prohibits the county from dictating how the sheriff spends those funds. *Id.* at 1323. The fourth factor does not point in either direction—counties are not responsible for adverse judgments against the sheriff in his official capacity, and no state law requires the state to pay those judgments either. *Id.* at 1324–28.

*Manders'*s discussion of the first and second factors is not directly applicable to the provision of medical care. We address them now. With respect to the second factor, control, Georgia courts have interpreted O.C.G.A. § 42-4-4(a)(2) as "giving sheriffs exclusive control vis-à-vis the county over choosing vendors for medical

care."[25] *Lake v. Skelton*, 840 F.3d 1334, 1339–40 (11th Cir. 2016). Specifically, the Georgia Supreme Court held:

> A sheriff is an elected, independent constitutional officer who is not an employee of the [county] board and is not, therefore, subject to the control of the board. The sheriff's duties include a duty to provide medical care to prisoners placed in his custody. To fulfill that duty, the sheriff is necessarily vested with authority to enter into contracts with medical care providers. The board cannot control the sheriff's choice.

*Bd. of Comm'rs of Spalding Cnty. v. Stewart*, 668 S.E.2d 644, 645 (Ga. 2008) (internal citations omitted). This supports the conclusion that a sheriff acts as an "arm of the state" when he provides medical care because the county has no control over the way such care is provided.

Finally, we consider the first factor—how Georgia state law defines the entity. *Manders* clearly stated that in addition to performing common law duties to enforce the law and preserve the peace on behalf of the State, the sheriff's office "perform[s] specific statutory duties, directly assigned by the *State*." *Manders*, 338 F.3d at 1319 (emphasis added). One such statutory duty assigned by the

---

[25] O.C.G.A. § 42-4-4(a)(2) reads, in pertinent part: "It shall be the duty of the sheriff . . . [t]o furnish persons confined in the jail with medical aid, heat, and blankets, to be reimbursed if necessary from the county treasury, for neglect of which he shall be liable to suffer the penalty prescribed in this Code section."

state is furnishing medical aid.  O.C.G.A. § 42-4-4(a)(2) ("It shall be the duty of the *sheriff* [t]o furnish persons confined in the jail with medical aid . . . ." (emphasis added)).

Further, in *Lake v. Skelton* we discussed O.C.G.A. § 42-5-2, according to which it is "the responsibility of the governmental unit, subdivision, or agency having the physical custody of an inmate to maintain the inmate, furnishing him food, clothing, and any needed medical and hospital attention."  840 F.3d at 1340 (quoting O.C.G.A. § 42-5-2).  We stated that Georgia law clearly required the *sheriff* to "take . . . custody of the jail and the bodies of such persons as are confined therein."  *Id.* (quoting O.C.G.A. § 42-4-4(a)(1)).  This meant that the *sheriff*, not the *county*, was the governmental unit with custody of the inmates.  *Id.*  Thus "Section 42-5-2 support[ed the] conclusion that Georgia imposes food-service responsibilities directly on the sheriff as part of his custodial duties."  *Id.*  If, under § 42-5-2, the sheriff wears a "state hat" with respect to food-service responsibilities, that same provision must lead to the conclusion that the sheriff wears a "state hat" with respect to the provision of medical care as well.  Indeed, our holding in *Lake* that the sheriff was an arm of the state with respect to providing food relied at least in part on the idea that, under Georgia law, the sheriff was an arm of the state with respect to providing medical care.  *See id.* at 1342.

As in *Manders* and *Lake*, the first three factors here weigh in favor of immunity.  The fourth factor does not defeat it.  Altogether, we conclude that Sheriff Jackson acted as an "arm of the

state" and is entitled to Eleventh Amendment immunity with respect to the particular function of providing medical care. The District Court correctly dismissed the claims against Sheriff Jackson in his official capacity.

### B.

We next turn to Appellants' argument that the District Court improperly dismissed their claims against Sheriff Jackson in his individual capacity for supervisory liability under 42 U.S.C. § 1983. A complaint is subject to dismissal under Rule 12(b)(6) when its factual allegations, on their face, establish an affirmative defense that bars recovery. *Ingram v. Kubik*, 30 F.4th 1241, 1250 (11th Cir. 2022). That means that if a defendant raises the affirmative defense of qualified immunity, the district court must dismiss any claims that do not allege a violation of clearly established law. *Id.*

Qualified immunity "shields a government official from liability unless he violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 951 (11th Cir. 2019) (quoting *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996)). The defendant asserting the qualified immunity defense bears the initial burden of showing that he or she was acting within his or her discretionary authority.[26] *Id.* at 951. After the defendant makes this showing,

---

[26] In the instant case, the parties do not dispute that Sheriff Jackson was acting within his discretionary authority.

the burden shifts to the plaintiff to show that qualified immunity is not appropriate. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

The Supreme Court has established a two-part test for evaluating a claim of qualified immunity. We must ask (1) whether, taken in the light most favorable to the injured party, the facts alleged show the officer's conduct violated a constitutional right; and (2) if the right violated under those alleged facts was clearly established at the time of the alleged violation. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S. Ct. 2074, 2080 (2011). Courts have discretion to consider these two questions in whichever order they find appropriate in light of the particular case. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009). For a plaintiff to overcome a claim of qualified immunity, both questions must be answered affirmatively. If the answer to one is "no," the court need not reach the other.

Turning to Appellants' supervisory liability claim, we begin by acknowledging that "the standard by which a supervisor is held liable in [his or her] individual capacity for the actions of a subordinate is extremely rigorous." *Christmas v. Harris Cnty.*, 51 F.4th 1348, 1355 (11th Cir. 2022) (quoting *Braddy v. Fla. Dep't of Lab. & Emp't. Sec.*, 133 F.3d 797, 802 (11th Cir. 1998)). It is well established in this Circuit that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Cotton v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (quoting *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)). "Instead, supervisory liability under § 1983

occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Id.* at 1360 (citing *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003)).

Here, Appellants do not allege that Sheriff Jackson personally participated in the alleged unconstitutional conduct, so they must allege facts that show a causal connection between his actions and the alleged constitutional deprivation. Appellants can meet that extremely rigorous challenge in several ways. A causal connection may be established when:

> (1) a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; (2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or (3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so.

*Mathews v. Crosby*, 480 F.3d 1265, 1270 (11th Cir. 2007) (internal quotation marks and citations omitted).

The complaint does not allege that Sheriff Jackson personally directed the Officers to act unlawfully or that he knew they would do so and failed to stop them. That leaves options one and two. With respect to the first, "[t]he deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather

than isolated occurrences." *Christmas*, 51 F.4th at 1355 (quoting *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1048 (11th Cir. 2014)). Any attempt by Appellants to demonstrate a causal connection between Sheriff Jackson and the alleged constitutional deprivation based on such a history of widespread abuse must fail. There is simply nothing alleged in the complaint demonstrating that Sheriff Jackson would have had notice of the alleged widespread abuse.

Three allegations in the complaint address alleged obvious, flagrant, rampant, and continued abuse. First, according to the complaint, "Fulton County, GA has paid numerous settlements and judgments based on the unconstitutional actions of the Fulton Sheriff and Sheriff deputies." This does not come close to showing a widespread history of abuse. There is no indication that the judgments and settlements were for the same types of allegedly unconstitutional actions. There is no indication that these incidents were of continued duration, as opposed to isolated incidents, with one occurring every few years. *See Clark v. Evans*, 840 F.2d 876, 885 (11th Cir. 1988) ("[I]t is clear that four cases in four years would have been insufficient to put [the Sheriff] on notice . . . .").

Second, the complaint alleges that Sheriff Jackson permitted a custom of excessive force by permitting unwarranted use of tasers on inmates, "as evidenced by jail staff and inmates hearing deputies use the term 'Taser Tuesday' on the day Mr. May was TASED at the jail." But that statement by itself does not indicate that such a policy or custom existed. There is no indication in the complaint of even a single other allegedly unwarranted tasing.

22-10441                Opinion of the Court                29

Finally, the complaint alleges that Sheriff Jackson's deliberate indifference through his "failure or failures to train as alleged" are "failures of policy, widespread practice, and/or custom." But again, the complaint does not allege any facts outside of the incident with May, and an isolated incident does not give sufficient notice of a failure to train. The abuses must be of a continuous nature.

The last remaining avenue for establishing a causal connection is to show a custom or policy that resulted in deliberate indifference to May's constitutional rights. Appellants can also allege "that the *absence* of a policy led to a violation of constitutional rights." *Piazza*, 923 F.3d at 957 (citing *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991)). A policy is a "decision that is officially adopted by the [law enforcement agency], or created by an official of such rank that he or she could be said to be acting on behalf of the [law enforcement agency]." *Christmas*, 51 F.4th at 1356 (quoting *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997)). "A custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law." *Id.* (quoting *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1332 (11th Cir. 2007)). "Demonstrating a policy or custom requires showing a persistent and wide-spread practice." *Goebert*, 510 F.3d at 1332 (quoting *Depew v. City of St. Mary's*, 787 F.2d 1496, 1499 (11th Cir. 1986) (alterations adopted)). Importantly, the unconstitutional act "must have been carried out pursuant to the alleged policy or custom." *Christmas*, 51 F.4th at 1356 (internal quotation marks and citations omitted).

But proving that a policy (or absence thereof) or custom caused a constitutional harm would require Appellants to point to multiple incidents. *Piazza*, 923 F.3d at 957 (citing *Rivas*, 940 F.2d at 1495–96); *see also Grech v. Clayton Cnty.*, 335 F.3d 1326, 1330 (11th Cir. 2003) (en banc) ("Because a county rarely will have an officially-adopted policy of permitting a particular constitutional violation, most plaintiffs [ ] must show that the county has a custom or practice of permitting it and that the [ ] custom or practice is the moving force behind the constitutional violation."). "A single incident of a constitutional violation is insufficient to prove a policy or custom even when the incident involves several subordinates." *Piazza*, 923 F.3d at 957 (alteration adopted) (quoting *Craig v. Floyd Cnty.*, 643 F.3d 1306, 1312 (11th Cir. 2011)). Under § 1983, proof of a single incident of unconstitutional activity is only sufficient to impose liability on a governmental entity as part of a policy or custom if the challenged policy itself is unconstitutional. *Ireland v. Prummell*, 53 F.4th 1274, 1289 (11th Cir. 2022) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S. Ct. 2427, 2436 (1985) (plurality opinion)); *see also Craig v. Floyd Cnty.*, 643 F.3d 1306, 1311 (11th Cir. 2011) ("In the absences of a series of constitutional violations from which deliberate indifference can be inferred, the plaintiff must show that the policy itself is unconstitutional." (cleaned up)).

The complaint focuses only on May's experience at the Fulton County Jail—it does not point to other instances of excessive force or deliberate indifference aside from noting that Fulton County has paid judgments and settlements for unknown claims in

the past. Because Appellants' complaint focuses solely on May's experience—a single incident of allegedly unconstitutional activity—and because none of the policies or customs it alleges are unconstitutional on their own, the complaint does not, as a matter of law, state a claim against Sheriff Jackson for supervisory liability. *See Piazza*, 923 F.3d at 958.

Because Appellants cannot overcome Sheriff Jackson's defense of qualified immunity, the District Court correctly granted his motion to dismiss.

## III.

Next, we address Appellant's argument that the District Court improperly granted summary judgment to the Officers for the 42 U.S.C. § 1983 excessive force and deliberate indifference claims against them. We review a district court's grant of summary judgment based on qualified immunity *de novo*. *Stephens v. DeGiovanni*, 852 F.3d 1298, 1313 (11th Cir. 2017). Summary judgment is proper where the evidence "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, we review the evidence, draw all reasonable inferences, and resolve all doubts in favor of the non-moving party—but only to the extent supportable by the record. *Baxter v. Roberts*, 54 F.4th 1241, 1253 (11th Cir. 2022). In cases where a video contradicts the non-movant's version of the facts, we accept the video's depiction instead and view the facts in the light depicted by the video. *Id.* (quoting *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018)). "We

may affirm on any ground supported by the record, regardless of whether that ground was relied upon or even considered below." *Waldman v. Conway*, 871 F.3d 1283, 1289 (11th Cir. 2017) (per curiam).

The Officers raised the affirmative defense of qualified immunity. Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[27] *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). We have said that qualified immunity "protect[s] from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Ferraro*, 284 F.3d at 1194 (internal quotation marks and citation omitted).

The same two-part test discussed in part II.B, *supra*, applies in the summary judgment context as well: to overcome a defense of qualified immunity, Appellants must show (1) the Officers violated a constitutional right and (2) that right was clearly established at the time of the alleged violation. *Piazza*, 923 F.3d at 951. "Clearly established" means that "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks and citations omitted). That is, "existing law must have

---

[27] It is undisputed that the Officers were acting in their discretionary capacity.

placed the constitutionality of the officer's conduct 'beyond debate.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 741, 131 S. Ct. at 2083). Plaintiffs can show that a constitutional right was clearly established in three ways:  (1) citing case law with indistinguishable facts that clearly establishes the constitutional right; (2) pointing to a broad statement of principle within the Constitution, statute, or case law that clearly establishes the constitutional right; or (3) alleging conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law. *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009) (citing *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005)).

### A.

Claims alleging excessive force by pretrial detainees are governed by the Fourteenth Amendment's Due Process Clause. *Crocker v. Beatty*, 995 F.3d 1232, 1246 (11th Cir. 2021).  A detainee must show "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 397, 135 S. Ct. 2466, 2473 (2015).  If an officer used objectively unreasonable force, he or she violated a detainee's Fourteenth Amendment rights.  This would satisfy the first prong of the qualified immunity analysis.

Objective reasonableness turns on the "facts and circumstances of each particular case." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989)).  A court "must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the

20/20 vision of hindsight." *Id.* The following non-exhaustive list of factors bears on the reasonableness of the force used:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* A court also needs to consider the "legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (internal quotation marks and citation omitted) (alteration adopted).

We may not examine the actions of a group of defendants collectively. "[E]ach defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions. So we must be careful to evaluate a given defendant's qualified-immunity claim, considering only the actions and omissions in which that particular defendant engaged." *Alocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018).

The only allegedly excessive uses of force addressed by Appellants in this Court are: (1) Officer Cook's use of his taser; (2) Officer Strowder's closed-fist strikes; and (3) Officers Delacruz, Cook, Whitaker, Roache, and Jackson's use of additional restraints.

As explained below, the District Court did not err in granting summary judgment with respect to these claims.

1.

Officer Cook's use of his taser against May was not objectively unreasonable force and did not violate May's constitutional rights when viewed under the *Kinglsey* factors. Officer Cook approached May's cell because May was naked and masturbating in violation of jail policy and state law. May actively resisted Cook's directive for May to put his clothes on. Officer Cook's interaction with May stemmed from the need to preserve internal order and discipline and to maintain institutional security. Officer Cook's use of the taser came after several attempts to get May to comply. Officer Cook reasonably perceived May to be a threat because May was noncompliant and took an aggressive stance. In fact, all three officers present at that moment perceived May to be a threat. Further, after being tased by Officer Cook, May continued to resist and became even more combative, indicating that his injuries from the taser were not severe. Under the *Kingsley* factors, then, Officer Cook's use of his taser was reasonable under the circumstances. This conclusion also conforms to this Court's precedent. *See Draper v. Reynolds*, 369 F.3d 1270, 1277–78 (11th Cir. 2004) (holding that a single use of a taser to subdue a hostile, belligerent, and uncooperative suspect was not excessive force).

Appellants' primary argument is that the Officers' testimony that May stepped towards Officer Cook is not credible and that without that fact, Officer Cook's initial use of the taser was

unreasonable. They argue that if May had stepped toward Officer Cook, as several officers stated in their depositions, the taser prong would not have landed on his lower back. The autopsy report shows a 1/8 x 1/8 inch blackened abrasion with a central puncture mark on the lateral right side of May's lower back, just above the right buttock. Officer Jackson's after-incident report and deposition testimony confirm that this was the taser probe fired by Officer Cook. Appellants also argue that the Officers' testimony that May stepped towards Officer Cook—a crucial fact—is unreliable because it contradicts the written statements made after the incident, because none of the Officers were wearing body cameras, and because the Officers were "likely coached by [their] counsel to fit [their] testimony within the confines of qualified immunity."

There may be a question as to whether May stepped toward Officer Cook. Appellants are correct that none of the officers mentioned the alleged step in their incident reports. But we need not address whether May stepped toward Officer Cook. Even assuming that he *didn't*, it was reasonable under the circumstances for Officer Cook to tase May. The undisputed record, when viewed in the light most favorable to Appellants, shows that (1) May was naked in his cell in violation of jail policy and state law; (2) Officer Cook repeatedly instructed May to put his clothes on; (3) May refused to comply; (4) May was defiant and took an aggressive stance; (5) Officer Cook tased May; (6) the taser was only partially effective; and (7) May jumped back up almost immediately and continued to resist. These facts, when viewed through the lens of the *Kingsley* factors, do not suggest that Officer Cook's initial use of his

taser on May was objectively unreasonable, so we cannot say that Officer Cook violated May's Fourteenth Amendment rights.

We have said that "where a suspect appears hostile, belligerent, and uncooperative, use of a taser might be preferable to a physical struggle causing serious harm to the suspect or the officer." *Smith v. LePage*, 834 F.3d 1285, 1294 (11th Cir. 2016). That fairly describes the situation in this case. May was naked in his cell in violation of jail policy and state law. When Officer Cook told him to get dressed, he replied "I ain't doing that shit." May then assumed an aggressive stance—or, as Officer Cook described it, a "fighting stance. Closed, clenched fists, separated feet." Doc. 209-5 at 24:14–15. May's conduct reasonably caused Officer Cook to believe May wanted to harm him.

Under our precedent, and given the situation that he confronted, Officer Cook was within his rights to tase May. We have declined to find a Fourth Amendment violation in similar circumstances. In *Draper v. Reynolds*, we held that it was reasonable to tase a suspect who defied lawful orders, "used profanity, moved around and paced in agitation, and repeatedly yelled" at law enforcement. 369 F.3d at 1278. All that was also true here. If anything, May's aggressive stance made the situation here more volatile, in that it gave the officers reason to believe that a brawl might ensue. So if it was reasonable to tase the suspect in *Draper*, it was reasonable to tase May here. *See id.* (observing that trying to use force to subdue the suspect, rather than deploying the taser, could have "escalated a tense and difficult situation into a serious struggle"). As such, the

District Court properly granted Officer Cook summary judgment based on qualified immunity.

2.

Nor were the closed-fist strikes delivered by Officer Strowder objectively unreasonable. Officer Strowder, both in her deposition and her after-incident statement, said that she saw her colleagues involved in an altercation with May and stepped in to help handcuff May, who continued to resist and grabbed her handcuffs. Strowder testified that she gave May verbal commands to drop the cuffs and that when he did not comply, she struck him with a closed fist four times—once in each of the face, arm, hand, and back.

In the first place, Appellants attempt to create a genuine issue of material fact by arguing that Officer Copeland's deposition testimony directly contradicts Officer Strowder's version of events. According to Appellants, Officer Copeland's testimony shows that "May permitted the officers to handcuff him without any issues." Officer Copeland did not dispute Officer Strowder's testimony; he said he did not recall May grabbing her handcuffs, or her delivering closed-fist strikes—not that those things did not occur. But even if he had disputed Officer Strowder's recollection of events, Officer Copeland's testimony was not, as Appellants argue, that May "did not resist being placed in handcuffs and permitted the officers to handcuff him without any issues." Officer Copeland indicated that there was an ongoing struggle—as did the testimony of every officer involved.

Even under the most favorable version of events, there is simply no dispute that an active struggle was ensuing in the holding cell. Under the *Kingsley* factors, Officer Strowder's punches were not objectively unreasonable given the struggle between May and the Officers—regardless of whether he grabbed her handcuffs. May actively resisted. Officer Strowder gave May verbal warnings. Her closed-fist strikes were in response to that resistance and the safety and security risks May posed. The injury resulting from the punches was relatively minimal.

Because Officer Strowder's use of force was not clearly unreasonable, she did not violate May's Fourteenth Amendment rights. The District Court properly granted her summary judgment as well.

### 3.

Finally, Appellants argue that Officers Delacruz, Cook, Whitaker, Roache, and Jackson used excessive force when they placed additional restraints on May while he was in the restraint chair. We need not decide if one of May's constitutional rights was violated by the additional restraints because, even if it was, that right was not clearly established.[28]

---

[28] It is true that Officers Delacruz, Cook, Whitaker, Roache, and Jackson were disciplined for violating Fulton County Jail policy with respect to the additional restraints. But violation of a local policy or procedure does not automatically mean that May's constitutional rights were violated. *See Davis v. Scherer*, 468 U.S. 183, 194, 104 S. Ct. 3012, 3019 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their

Appellants can show that a constitutional right was clearly established in three ways: (1) citing case law with indistinguishable facts; (2) pointing to a broad statement of principle within the Constitution, statute, or case law; or (3) alleging conduct so egregious that everyone would know it violated the Constitution. *Lewis*, 561 F.3d at 1291–92. There is simply no case law with indistinguishable facts that would clearly establish this constitutional right, nor do Appellants point to any. In fact, most case law in this Circuit would tend to indicate that the use of restraints was permissible. *See, e.g.*, *Brown v. City of Hunstville*, 608 F.3d 724, 740 (11th Cir. 2010) ("For even minor offenses, permissible force includes physical restraint, use of handcuffs, and pushing into walls."). Similarly, Appellants do not point to a broad statement of principle within the Constitution, statute, or case law that would establish the right.

That leaves the third option—conduct so egregious that any person would know it was unconstitutional. Appellants argue that the preeminent case using egregious behavior to clearly establish a constitutional right—*Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508 (2002)—applies. In *Hope*, the defendant was placed in leg irons, handcuffed to a hitching post, and made to stand in the Alabama sun in June for seven hours with no shirt, no bathroom breaks, and only one glass of water. *Id.* at 734–35, 122 S. Ct. at 2512–13. His

---

conduct violates some statutory or administrative provision."). Simply because something is in violation of a policy, or even illegal, does not make it unconstitutional.

arms were above shoulder height the entire time. *Id.* at 734, 122 S. Ct. at 2512. The guards taunted him. *Id.* at 735, 122 S. Ct. at 2513.

But the situation in *Hope* is far removed from the type of behavior exhibited by the Officers here. Qualified immunity operates to make sure that "before they are subjected to suit, officers are on notice their conduct is unlawful," and serves to give them "fair warning." *Id.* at 739–40, 122 S. Ct. at 2515 (internal quotation marks and citations omitted). In the absence of case law or a broad statement or principle that clearly establishes a constitutional right, the behavior in question must be so obviously unconstitutional that any reasonable officer would have notice. That is just not the case here. We cannot say that using additional restraints to transport May from the holding cell to the shower and from the shower to the property room was so obviously unconstitutional that any officer would have fair warning that they were violating a detainee's constitutional rights.

Because it was not clearly established that the Officers' actions would have violated May's constitutional rights, we need not decide whether such a constitutional right existed. The District Court did not err in granting the Officers summary judgment with respect to the restraints.

*B.*

We now turn to Appellants' allegation that Officers Roache, Goodwine, Whitaker, Cook, Delacruz, Copeland, Jackson, and Lieutenant Paige exhibited deliberate indifference to May's serious medical need, in violation of the substantive component of the

Fourteenth Amendment's Due Process Clause, when they "literally stood by and watched Mr. May struggle and go unconscious without offering any assistance." This claim, like the excessive force claims discussed above, is subject to the same two-step qualified immunity analysis. Deliberate indifference claims made under the Fourteenth Amendment are held to the same standards as deliberate indifference claims made under the Eighth Amendment. *Goebert*, 510 F.3d at 1326.

A claim of deliberate indifference to serious medical needs includes both an objective and subjective component. *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020). Appellants must show (1) that May had an objectively serious medical need; (2) that the Officers acted with subjective deliberate indifference to that need; and (3) that the Officers' deliberate indifference caused May injury. *Patel v. Lanier Cnty.*, 969 F.3d 1173, 1188 (11th Cir. 2020).

The District Court assumed that Appellants established that May had an objectively serious medical need, so we will as well. But the District Court found—and we agree—that Appellants cannot establish a genuine issue of material fact as to the second element. The "deliberate indifference" element itself has three elements. A defendant is deliberately indifferent to a serious medical need when he or she (1) has subjective knowledge of a risk of serious harm; (2) disregards that risk; and (3) acts with more than gross negligence. *Id.* (quoting *Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1234 (11th Cir. 2010)).

Even if we assume that the Officers had subjective knowledge of the serious risk of medical harm, we cannot say that they disregarded that risk or that they acted with more than gross negligence. Taken in the light most favorable to Appellants, the video of the property room plainly shows that very soon after entering the property room, Didier conducted an initial examination of May, who was conscious, alert, and not showing any signs of distress at the time. Didier left to get medical equipment and while he was gone, May began to exhibit signs of distress. The video shows clearly that the Officers noticed the change in May and immediately responded. They began to touch him and see if he was alert. They undid his restraints and got him on the floor. They began to provide CPR until medical personnel arrived. That the Officers responded shows that they did not disregard May's needs, and the actions they took in responding were not "more than grossly negligent." Even if Appellants are correct, and the Officers should have taken May to Didier's office as opposed to waiting for Didier in the property room, that does not meet the high bar of being "more than grossly negligent."

Because Appellants cannot show that the Officers were deliberately indifferent to May's serious medical need, they cannot show his Fourteenth Amendment rights were violated. As such, the Officers are entitled to qualified immunity and the District Court did not err in granting them summary judgment.

**IV.**

We turn now to the final set of claims brought by Appellants—the Georgia medical negligence claims against Travis Williams and NaphCare.  The District Court granted summary judgment on these claims in favor of Williams and NaphCare.  The same summary judgment standards discussed earlier thus apply.

In Georgia, "[a] person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill.  Any injury resulting from a want of such care and skill shall be a tort for which a recovery may be had." O.C.G.A. § 51-1-27.  A claim under this medical malpractice statute essentially has three elements.  A plaintiff must show (1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure was the proximate cause of the injury sustained. *Med. Ctr. of Cent. Ga. v. Landers*, 616 S.E.2d 808, 813 (Ga. Ct. App. 2005).[29]  Further, O.C.G.A. § 9-11-9.1 requires plaintiffs to attach to the complaint an affidavit from an expert setting forth at least one negligent act or omission.[30]  To

---

[29] The first element of the claim—that a doctor-patient duty exists—is not in dispute.  Fulton County Jail contracted with NaphCare to provide the medical care needed at the jail.

[30] "In any action for damages alleging professional malpractice against:  (1) [a] professional licensed by the State of Georgia . . . the plaintiff shall be required to file with the complaint an affidavit of an expert competent to testify, which affidavit shall set forth specifically at least one negligent act or omission claimed to exist and the factual basis for each such claim." O.C.G.A. § 9-11-9.1(a).

satisfy this requirement, Appellants attached an affidavit from Dr. Joseph Wright.

### A.

The second element of a medical malpractice claim is dispositive with respect to Travis Williams. Taking the facts in the light most favorable to Appellants, as we must, the record shows that May arrived at the Fulton County Jail around 9:00 AM on September 11, 2018. Williams conducted his intake screening. May told Williams that he was suicidal but that he did not plan to harm himself. The arresting officer gave Williams paperwork from Grady showing that May had methadone use disorder. Williams noted on the screening form that May was actively or suspected to be detoxing and that he had suicidal thoughts. After completing the screening, Williams took the form and placed it in the dedicated place for the provider to find it. Williams also told Didier, the medical provider on duty, that May had come in from Grady with methadone use disorder and substance-induced psychotic disorder, that he voiced thoughts of suicide, and that he was possibly detoxing.

Dr. Timothy Hughes, who served as Appellants' standard of care expert, argued that Williams breached the standard of care in two ways. First, Williams failed to immediately communicate information about May's drug problems and drug-induced psychotic behavior to the jail medical provider. Second, Williams failed to communicate May's claim of suicidal ideation to the appropriate medical or mental health provider for actionable medical orders.

Dr. Hughes testified that if Williams had communicated his findings to the medical provider, he would have complied with the standard of care.

But nothing in the record suggests—and therefore no reasonable jury could find—that Williams failed to communicate his findings. The intake screening form clearly shows that Williams marked that May was actively or suspected to be detoxing and that he had current suicidal thoughts. Williams's deposition testimony indicated that he took the intake sheet, went to the provider, and told him that May had methadone use disorder, was possibly detoxing, and had thoughts of suicide. The only evidence in the record that could even potentially challenge that testimony is Didier's testimony that he did not recall Williams informing him about May. But Didier never refuted that it happened—he simply indicated that he did not remember it.

Because all evidence in the record shows that Williams did not breach his duty of care to May, the District Court was correct in granting summary judgment in his favor.

*B.*

Finally, we address the medical negligence claim against NaphCare. We agree with Appellants that the District Court was too quick to grant NaphCare summary judgment. This claim turns on the third element of a Georgia medical malpractice claim—proximate cause.

A plaintiff cannot succeed on a medical malpractice claim, even if there is evidence of negligence, "unless the plaintiff

establishes by a preponderance of the evidence that the negligence either proximately caused or contributed to cause plaintiff harm." *Zwiren v. Thompson*, 578 S.E.2d 862, 864 (Ga. 2003) (internal quotation marks and citation omitted). To establish proximate cause by a preponderance of the evidence in a Georgia medical malpractice claim, the plaintiff must use expert testimony. *Id.* at 865. "Georgia case law requires only that an expert state an opinion regarding proximate causation in terms stronger than that of medical possibility, i.e., reasonable medical probability or reasonable medical certainty." *Id.* at 867. "What amounts to proximate cause is undeniably a jury question." *Id.* at 865 (quoting *Ontario Sewing Mach. Co. v. Smith*, 572, S.E.2d 533, 536 (Ga. 2002)); *see also Dowdell v. Wilhelm*, 699 S.E.2d 30, 32 (Ga. Ct. App. 2010) ("Normally, questions of proximate cause are for the jury, but plain and indisputable cases . . . may be decided by the court as a matter of law."). That question must be "determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy and precedent." *Zwiren*, 578 S.E.2d at 865 (quoting *Atlanta Obstetrics & Gynecology Grp. v. Coleman*, 398 S.E.2d 16, 17 (Ga. 1990)).

In their response to NaphCare's motion for summary judgment, Appellants relied mainly on the medical report and deposition of Dr. Timothy Hughes, but also referred to the report and deposition of Dr. William Anderson, as well as the affidavit from Dr. Wright that they had attached to their complaint as required by O.C.G.A. § 9-11-9.1.

As relevant here, Dr. Hughes's report stated:

> It is my expert opinion that had Mr. May been appro-
> priately screened and examined with the correct and
> prompt follow through by NaphCare medical staff, to
> include immediate classification to suicide watch and
> to have appropriate sedation ordered for his metham-
> phetamine-induced psychotic behavior, the events
> that transpired and culminated in an episode of ex-
> cited delirium and subsequent sudden cardiac
> death—further exacerbated by the use of force sec-
> ondary to his untreated psychotic behaviors—would
> in all medical probability not [have] occurred.[31]

In short, Dr. Hughes's report concluded the failure of NaphCare medical staff to properly screen, examine, and treat May was the proximate cause of his death. This testimony is supported by both Dr. Anderson[32] and Dr. Wright.[33]

---

[31] In his deposition, Dr. Hughes twice stated that, had earlier intervention and observation on the part of NaphCare occurred, it is "more probable than not" that the confrontation—and May's death—would not have occurred.

[32] Dr. Anderson testified that had May been treated medically, as opposed to with force, the outcome would have been different.

[33] According to Dr. Wright: "Had Mr. May been closely observed in a medical setting and put on chemical sedation at the Fulton County Jail as opposed to being placed in a holding cell with no medical treatment, with a reasonable degree of medical certainty, the confrontation between the deputies and Mr. May would not have occurred, or Mr. May would have been treated differently based on his medical and psychological issues, thereby preventing his death."

The District Court held that, even if it was admitted, this testimony "would not provide sufficient support for a medical malpractice claim under Georgia law." Order, Doc. 240, at 29–30. According to the Court, May's altercation with the Officers occurred between the actions of the NaphCare defendants and May's death. The Court found that "too many actions and choices made by May and the Officers stand in between the decisions of the Naphcare defendants and May's death to deem their failure to sedate May the proximate cause of the events." *Id*. at 30. As such, the District Court held that the encounter between May and the Officers broke the natural and continuous sequence of events required for proximate cause. *Id*. at 30–31.

We agree with Appellants that, based on Dr. Hughes's testimony, there is enough of a genuine issue of material fact for NaphCare's liability to reach a jury. Dr. Hughes did not solely rest his argument on NaphCare's failure to sedate May. It was the failure of the staff to follow through with May *at all* that was the problem. While this included the need for sedation, it also included immediate classification to suicide watch and observation.

This is not a "plain and indisputable" case. Dr. Hughes clearly stated that, in his medical opinion, May's death "would in all medical probability not occurred," but-for breach of the standard of care by NaphCare. To be clear, we do not hold that NaphCare's employees *were* the proximate cause of May's death. We hold only that, based on Dr. Hughes's testimony, there is a *genuine issue of material fact* as to whether NaphCare employees were

the proximate cause of May's death.  A reasonable jury could find that they were.[34]

## V.

We affirm the District Court's dismissal of the claims against Sheriff Jackson in both his official and individual capacities.  We also affirm the grant of summary judgment to the Officers and Travis Williams.  We vacate, however, the grant of summary judgment to NaphCare, and we remand the matter to the District Court.[35]

---

[34] Prior to its motion for summary judgment, NaphCare moved to exclude portions of Dr. Hughes's report and subsequent testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579, 113 S. Ct. 2786 (1993).  Namely, NaphCare argued that Dr. Hughes's opinions "amount[ed] to nothing more than speculation and personal opinions with no identifiable scientific support, and so they must be excluded."  The District Court denied this motion as moot in its order granting summary judgment to NaphCare.  Our holding also says nothing as to the admissibility of Dr. Hughes's opinions.

[35] The District Court only had jurisdiction over the state medical negligence claim because it exercised supplemental, or pendent, jurisdiction over it.  *See* 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts shall have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").  When, as here, the federal claims have been disposed of and all that remains is the state law claim, we have encouraged the dismissal of the remaining state law claim. *See Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018) ("When all federal claims are dismissed before trial, a district court should typically dismiss the pendent state claims as well.").  At the very least, the District Court must be mindful of its obligation to ensure that the factors underlying supplemental jurisdiction—

22-10441               Opinion of the Court                    51

**AFFIRMED IN PART, VACATED AND REMANDED IN PART**

---

judicial economy, convenience, fairness, and comity—continue to weigh in favor of exercising jurisdiction. *See Ameritox, Ltd. v. Millennium Lab'ys, Inc.*, 803 F.3d 519, 537 (11th Cir. 2015) ("[O]nce a district court possesses discretion to dismiss the supplemental claims, it must be continuously mindful regarding whether or not the factors favor dismissal.").