[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10934

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

VICTOR HILL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cr-00143-ELR-CCB-1

_____

Before ROSENBAUM, NEWSOM, and MARCUS, Circuit Judges.

ROSENBAUM, Circuit Judge:

The notion that "[n]o man is above the law and no man is below it"[1] is fundamental to our democratic republic's continuing viability. That principle applies equally to sheriffs (and other officers of the law) and detainees. And 18 U.S.C. § 242 vindicates that principle. It imposes criminal liability on anyone who, under color of law, willfully deprives another person of their constitutional rights. Under § 242, a jury convicted Victor Hill, the former Sheriff of Clayton County, Georgia, of using his position as the Sheriff to deprive detainees in his custody of their constitutional rights. Hill now appeals.

Hill oversaw the Clayton County Jail. At that jail, officers used restraint chairs for "safe containment" of pretrial detainees "exhibiting violent or uncontrollable behavior." But six times, Hill ordered individual detainees who were neither violent nor uncontrollable into a restraint chair for at least four hours, with their hands cuffed behind their backs (or, in one instance, to the sides of the chair) and without bathroom breaks. Each detainee suffered injuries, such as "open and bleeding" wounds, lasting scars, or nerve damage. Based on these events, a jury convicted Hill of six

---

[1] President Theodore Roosevelt, Third Annual Message to Congress (Dec. 7, 1903), https://www.presidency.ucsb.edu/documents/third-annual-message-16 [https://perma.cc/W6UT-AAEG].

counts of willfully depriving the detainees of their constitutional right to be free from excessive force, in violation of § 242.

Hill challenges that conviction on three grounds. We reject each one. First, Hill had fair warning that his conduct was unconstitutional—that is, that he could not use gratuitous force against a compliant, nonresistant detainee. Second, sufficient evidence supported the jury's conclusion that Hill's conduct had no legitimate nonpunitive purpose, was willful, and caused the detainees' injuries. Third, the district court did not coerce the jury verdict but properly exercised its discretion in investigating and responding to alleged juror misconduct.

So after careful consideration, and with the benefit of oral argument, we affirm Hill's conviction.

## I.    BACKGROUND

### A.  Factual Background[2]

Defendant-Appellant Victor Hill served as Sheriff of Clayton County, Georgia, from 2005 to 2008 and from 2013 to 2022. As Sheriff, Hill oversaw the county jail, where pretrial detainees are incarcerated. Hill characterized the jail, under his supervision, as a "paramilitary facility" with "a lot of rules" like "in a military boot camp."

---

[2] We take these facts from the evidence presented at trial, and we view them in the light most favorable to the verdict. *United States v. Verdeza*, 69 F.4th 780, 785 n.1 (11th Cir. 2023).

In his role as Sheriff, Hill received annual use-of-force trainings. Consistent with this training, Hill adopted a use-of-force policy defining "excessive force" as "any force used in excess of the amount of force reasonably required to establish control over or to prevent or terminate an unlawful act of violence."

In 2018, Hill bought restraint chairs for the Clayton County Jail and established a policy for their use. At trial, the Government introduced the following photo of a restraint chair:



Hill adopted a general policy for the use of all types of physical-restraint devices.  It provided that a detainee posing a risk of "actual violence for [himself] or others . . . shall be placed into isolation" first.  And it emphasized that only if the detainee "continues to exhibit physical violence toward staff, [himself], or others" should he "be placed into restraints."

Besides this policy, Hill adopted a specific restraint-chair policy.  Under it, the chairs were "for emergencies," such as "safe containment of an inmate exhibiting violent or uncontrollable behavior" and preventing "self-injury, injury to others or property damage."  Chair use, the policy continued, could "never be authorized as a form of punishment."  And when a situation called for chair use, officers were to remove handcuffs, and detainees were to be "kept in the restraint chair no longer than four (4) hours unless exigent circumstances exist, i.e., inmates [sic] continued violent behavior."  Also under the policy, a detainee had to receive medical clearance before being put in the chair.  Finally, the policy mandated regular medical checks and "scheduled exercise periods" for those who were restrained.

Hill and his deputies used the chair about 600 times.  According to Hill, he ordered chair use as a "preventative measure" based on "pre-attack indicators" and the "totality of [the] circumstances."  And when Hill ordered chair restraint of a detainee, only Hill could order his release from the chair, typically after "at least four hours."

6                  Opinion of the Court                  23-10934

This case concerns Hill's restraint-chair use on six[3] pretrial detainees in 2019 and 2020. We recount the facts of each arrest and detention, organized by detainee, below.

### 1. Raheem Peterkin

In December 2019, Raheem Peterkin was arrested for allegedly pointing a gun at two men outside his apartment and "barricading" himself in the apartment despite officers' repeated requests to come outside. According to the arresting officer, during his arrest and booking, Peterkin was never violent, uncontrollable, or threatening.

After Peterkin arrived at the jail, Hill and specialized security officers—known as the "Scorpion Response Team" ("SRT")—visited Peterkin's holding cell and questioned Peterkin about his alleged offenses. Hill said, "I wish I was there. I would have riddled your ass with bullets." And then he told SRT members to "put that bitch in the chair."

On Hill's order, officers strapped Peterkin into a restraint chair. Peterkin remained there, with his hands cuffed behind his back, for four hours. While in the chair, Peterkin experienced pain in his wrist and side. He testified that the pain was "the worst thing [he] ever felt," and the restraints left scars on both of his wrists.

---

[3] The indictment charged Hill with seven counts, for seven detainees. But the jury acquitted Hill of one count: the count related to Joseph Harper. That acquittal is not before us on appeal.

Officers did not allow him to use the restroom, so he was forced to urinate on himself.

### 2. Desmond Bailey

In February 2020, officers arrested Desmond Bailey for drug and firearm possession. While officers were executing a search warrant, Bailey left his house in a car, requiring officers to follow him before they could stop and arrest him. The arresting officer testified that during his arrest and booking, Bailey was never violent, uncontrollable, or threatening.

In his holding cell at the jail, Bailey told detectives that he did not want to speak to them without a lawyer present. But several hours later, Hill, the detectives, and SRT members arrived, and Hill questioned Bailey about his alleged offenses. Bailey again refused to answer questions without a lawyer present. Hill replied, "You think you're a big badass. Oh, you think you're a gangster. Put his ass in the chair."

On Hill's order, officers strapped Bailey into a restraint chair. There Bailey sat, with his hands cuffed behind his back, for six hours. Bailey described his time in the chair as "horrible" and "terrifying." He testified that he was in extreme pain and eventually felt numb. The restraints cause Bailey to suffer "open and bleeding" cuts on both wrists, which required medical treatment and left scars.

### 3.  Joseph Arnold

In February 2020, officers arrested Joseph Arnold for assaulting two elderly women during a dispute about who was next in line at a grocery store, though they did not arrest him until three weeks after the incident.  Following the incident, Hill put Arnold on the Sheriff's Department's "top ten" most wanted list and offered "$2500 of [his] own money to anyone who would lead authorities to identify" Arnold.  The arresting officer testified that Arnold was cooperative, non-threatening, and did not resist arrest.

Upon Arnold's arrival at the jail's booking area, Hill confronted Arnold.  The jury saw an officer's surreptitious recording of that interaction.  When Arnold, who was handcuffed, asked whether he was entitled to a fair and speedy trial, Hill responded,

> You entitled to sit in this chair, and you're entitled to get the hell out of my county and don't come back.  That's what you're entitled to.  You sound like a damn jackass.  Don't you ever put your hand on a woman like that again.  You're fortunate that wasn't my mother or grandma or you wouldn't be standing there.  Now, sit there and see if you can get some damn sense in your head.

On Hill's order, officers strapped Arnold into a restraint chair.  There Arnold remained, with his hands cuffed to the sides of the chair, for at least four hours.  Arnold testified that the restraints were "painful and humiliating" and left marks on his wrists that did not heal for weeks.

### 4.  Cryshon Hollins (C.H.)

In April 2020, officers arrested Cryshon Hollins (then 17 years old) for vandalizing his family's home.  Deputy Allen, who happened to be Hill's godson, spoke with Hill on the phone, texted Hill a photo of Hollins handcuffed in the back of the police car, and had this text message exchange with Hill:

> Hill: How old is he?
>
> Allen: 17
>
> Hill: Chair

Again, the arresting officers, as well as officers who were in the jail's intake area, testified that Hollins was never violent, uncontrollable, or threatening.

On Hill's order, officers strapped Hollins into a restraint chair immediately upon his arrival at the jail.  Hollins cried because he felt like he was "being tortured," and he was forced to urinate on himself.  After four to five hours, officers released Hollins from the chair, and he fell asleep in a holding cell.

An hour later, Hill scolded Hollins for disrespecting Hollins's mother and ordered SRT members to strap Hollins into the restraint chair.  There Hollins sat for another five or six hours, with his hands cuffed behind his back.  Hollins testified that the restraint felt "like torture" and left visible marks on his wrists and ankles.

During the second restraint, Hill recorded a video of himself, Hollins, and Joseph Harper, who was strapped into another restraint chair in the same room.  In that video, among other

things, Hill said, "If I hear about you messing up your mama's house again . . . I'm a sit your ass in that chair for sixteen hours straight . . . I need to hear from both of y'all that y'all not gonna show y'all's ass in my county no more."  Hill texted that video to his girlfriend.

At trial, Hill claimed that he tried to be "convincing" and do what Hollins's mother wasn't "capable of doing."  Hill testified that "the experience [Hollins] had overall," and "the discussion [Hill] had with him, is part of the reason why he's out of trouble now."

### 5.  Glen Howell

In April 2020, Glen Howell and Lieutenant Guthrie had a payment dispute over landscaping work that Howell performed (unrelated to Guthrie's employment).  One night, Hill called Howell to ask why he was "harassing" Guthrie, to which Howell responded by telling Hill to "go f himself" and hanging up.  Because Howell didn't believe the caller was Hill but "thought somebody was impersonating the Sheriff," Howell called Hill back via FaceTime.  On that call, Howell said, "Now you work for me," to which Hill replied, "I'm coming to get you."  Hill then texted Howell and warned Howell not to contact him anymore or Howell would be arrested for harassing communications.  Howell responded, "So this is Victor Hill correct," but did not otherwise contact Hill again.

Hill still instructed a deputy to prepare an arrest warrant for misdemeanor harassing communications.  After texting Howell multiple times about the warrant, Hill sent a fugitive squad two

counties over to arrest Howell.  Two days later, after retaining counsel, Howell turned himself in.  Surveillance footage and officers' testimony both reflect that Howell was cooperative and compliant during arrest and booking.

After Howell turned himself in, Hill arrived at the jail, accompanied by Lieutenant Guthrie.  Howell tried to shake Hill's hand.  But Hill replied, "We're way past that. You had an opportunity to fix this before this part."  Hill then ordered deputies to "put [Howell] in the chair," and they strapped Howell in with his hands cuffed behind his back.  There Howell sat for at least four hours.  Hill said that he was "going to teach [Howell] a lesson" and "if [Howell] crossed him or one of his deputies again, it [would] be the sniper team."

Howell testified that, while in the chair, he felt the "worst feeling of [his] life."  Although he "asked for a medic" because he felt like he was having a "panic attack," officers "denied [him] a medic."  The restraints left visible marks on his wrists and caused his hands to swell.  Howell also testified that he still suffers neck, back, arm, leg, and toe pain and numbness from a pinched nerve, which affects his ability to work.[4]

---

[4] Howell also filed a civil lawsuit against Hill seeking damages under 42 U.S.C. § 1983.  *Howell v. Hill*, No. 1:20-cv-02662-WMR (N.D. Ga.).  In that case, the district court denied Hill's motion for summary judgment on qualified-immunity grounds.  Hill's appeal is pending before this Court.

### 6. *Walter Thomas*

In May 2020, an officer arrested Walter Thomas for speeding and driving with a suspended license. The arresting officer testified that Thomas (though crying, cussing, and pleading with the officer not to take him to jail) was never violent, uncontrollable, or threatening.

In the holding cell at the jail, an officer told Thomas to stand up and face the wall while Hill approached. When a female officer told Thomas not to put his head against the wall, Thomas turned to look at her. SRT members then pinned Thomas against the wall. Thomas tried to explain that he was there for only a suspended license, but Hill told him to "shut up" and ordered SRT to strap him into a restraint chair.

Following Hill's orders, officers strapped Thomas into the chair, and there he remained for five or six hours with his hands cuffed behind his back. While Hill was still present, officers covered Thomas with a "spitting hood" (even though he had not been spitting) and punched him in the face, which caused a bruised lip. Thomas cried and urinated on himself several times. And no officers or nurses came to check on him; indeed, he "had to kick the door for somebody to come check on" him. He testified, "I never

23-10934                Opinion of the Court                13

felt that pain never [sic] before.  Like, literally, I wouldn't wish that on my worst enemy."[5]

### B.  Procedural History

A federal grand jury indicted Hill for "willfully depriv[ing]" the detainees of their constitutional "right to be free from the use of unreasonable force by law enforcement officers amounting to punishment," "under color of law" and with resulting "bodily injury."  *See* 18 U.S.C. § 242.  That right derives from the Fourteenth Amendment's Due Process Clause.  *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989).  Hill moved to dismiss the indictment.  He asserted that he lacked fair warning that his conduct was criminal.  The district court denied that motion.

At trial, after the Government rested, Hill moved for a judgment of acquittal.  *See* Fed. R. Crim. P. 29(a).  He argued that insufficient evidence supported the conclusions that (1) his use of the restraint chair was objectively unreasonable; (2) he acted willfully; and (3) he caused the detainees' injuries.  The district court denied that motion.  Hill renewed his motion at the close of the defense's evidence, but the court again denied that motion.  Hill also repeatedly moved for a mistrial during jury deliberations, as we discuss below.

---

[5] Thomas also filed a civil § 1983 lawsuit against Hill.  *Thomas v. Hill*, 1:22-cv-3987 (N.D. Ga.).  That lawsuit appears to have stalled or been dropped.  The only docket entries include the complaint and summons.

14                    Opinion of the Court                    23-10934

### 1. *Jury Deliberations and Verdict*

The court submitted the case to the jury, and just after noon, the jury began its deliberations. Upon request, the court released the jury for the day around 4:30 p.m.

The next day of deliberations, at around 2:45 p.m., the jury sent the judge a note. It said that the jury had "agreed on [two] counts" but was "deadlocked" on the other five.

The Government requested an *Allen* charge.[6] For his part, Hill asked the court to take the verdict on the two counts and declare a mistrial on the remaining five counts. The district court then gave the Eleventh Circuit pattern modified *Allen* charge.[7] In delivering that charge, though, the district court omitted the sentence, "The trial has been expensive in time, effort, money, and emotional strain to both the defense and the prosecution."

Roughly an hour later, the jury foreperson sent a note asking how the jury should proceed "if a juror is exhibiting the inability to understand the [court's] instructions," "displaying general confusion with basic words, [and] altering meanings of words to conform with personal opinions." The note did not identify the juror, describe the juror as a holdout, or claim that the jury was

---

[6] *See Allen v. United States*, 164 U.S. 492, 501–02 (1896).

[7] Judicial Council of the U.S. Eleventh Judicial Circuit, Criminal Pattern Jury Instruction T5 (Mar. 2022), https://www.ca11.uscourts.gov/sites/default/files/courtdocs/clk/FormCriminalPatternJuryInstructionsRevised-MAR2022.pdf [https://perma.cc/WE27-FN36].

deadlocked. The court responded in writing, "We've given you the instructions, and it is up to you to deliberate according to those instructions, and work within them to arrive at a verdict." The jury deliberated for another half hour before requesting to be released until the next day because it was "not coming to an agreement."

The next morning, a juror informed the court that she could not continue because she was experiencing excruciating back pain. An alternate juror promptly replaced her. The district court instructed the reconstituted jury to "start [its] deliberations anew" and "disregard entirely any deliberations taking place before [the] alternate juror was substituted." The reconstituted jury then began deliberating.

Later that same morning, the foreperson sent a note "with questions regarding [a juror the foreperson later identified as Juror 6's] ability to: (1) answer yes/no questions, (2) acknowledge the law, [or] (3) be able to understand the instructions." Another juror wrote that the same juror (Juror 6) "appear[ed] to show the beginnings of cognitive impairment," was "unable to understand many basic English words," and "literally closed eyes and covered ears" during deliberations. And Juror 6 allegedly "stated that the Sheriff [and] the President are above the law and not required to follow the Constitution."

In response, the court questioned the foreperson and Juror 6, whom the foreperson identified as the subject of the notes. According to the foreperson, Juror 6 was engaging the other jurors but was not open to others' viewpoints and was not applying the

law or the court's instructions.  With Juror 6, the foreperson testified, "we just have not been able to get anywhere."  The court remembered Juror 6, who the court had to "help . . . through voir dire" and "lead[] . . . in his questions."  Juror 6 told the court that he had been engaging in deliberations and following the court's instructions, though he had "annoyed people" with his definitions of "intent and willful."  He also recounted that he had been called "inarticulate or crazy."  The court declined to dismiss Juror 6, and the jury resumed deliberations.

Shortly after 4 p.m., the jury sent the court three more notes, again questioning one juror's behavior and cognitive abilities.  The first stated that the juror did "not recall a large chunk of testimony," would "not respond" to questions, was "having difficulty construing sentences," and "was arguing with his notes."  The second added that the juror "state[d] he [was] biased against the detainees if they were violent" and "demonstrate[d] difficulty in separating different events and the order they occurred."  The third and final note said simply, "We are unable to reach a unanimous decision today.  Can we start tomorrow?"

Defense counsel again moved for a mistrial.  For its part, the Government requested that the jury be allowed to resume deliberations the next day.  Instead, the court proposed another *Allen* charge, to which defense counsel objected.  The court released the jury at 4:25 p.m.

The next day, the jury resumed deliberations.  Around 1:30 p.m., the court sua sponte gave the jury a modified[8] version of the pattern *Allen* instruction.  The transcript reflects that the court (apparently inadvertently) left out the word "not" in the following portion: "You must also remember that if the evidence fails to establish guilt beyond a reasonable doubt, the defendant must have your unanimous verdict of [not] guilty."  The court instructed the jury to apply the new charge "in conjunction with all the other instructions [it had] previously given."  Defense counsel objected to the court's decision to give the *Allen* charge but not to the substance of that charge (as written or read).

Around 2:30 p.m., the jury sent another note asking how to proceed if a juror stated that "they do not agree with the law in their opinion and [was] using that opinion to base their vote."  The court again separately questioned the foreperson, who confirmed the note was about Juror 6.  After that, the court received another note asking the court to "clarify" the willfulness instruction.

The court again called in Juror 6.  He told the court that he understood the law and was attempting to follow the law and the court's instructions, but he thought "there was a passage that can be taken two different ways."  The court left Juror 6 on the jury.

---

[8] The modifications included the removal of (1) the same sentence we've noted above and (2) the portion encouraging jurors in the minority to reexamine their positions.

But at defense counsel's request, the court asked the foreperson whether the jury was hopelessly deadlocked, to which the foreperson responded, "I would not like to make that determination right at this moment. . . . With further deliberations, it may be we can get somewhere."

Around 4:20 p.m., the jury announced it had reached a verdict of guilty on six of the seven counts and not guilty on the seventh (the count involving Harper).

### 2. Sentencing

The district court determined Hill's total offense level to be 23 and his Guidelines range to be 46 to 57 months. But it granted a "significant" downward variance, sentencing Hill to 18 months of incarceration. In doing so, the court characterized the case as "novel" and noted that Hill's behavior did not "involve violence, assaultive behavior, such as beating, tasing, shooting, et cetera, or an unlawful arrest." Neither party challenges Hill's sentence on appeal.

## II.    DISCUSSION

Hill challenges his § 242 conviction on three grounds. First, Hill claims that he lacked fair warning that his conduct was unconstitutional. Second, he argues that the district court abused its discretion in questioning a juror about alleged misconduct, giving two *Allen* charges to the jury, and omitting one word in the second *Allen* charge. Third, Hill asserts that the Government presented insufficient evidence that his conduct (1) had no legitimate nonpunitive

purpose, (2) was willful, and (3) caused the detainees' injuries. We find none of Hill's challenges availing.

### A. Hill had fair warning that his conduct violated the detainees' constitutional right to be free from excessive force.

We begin with Hill's claim that he lacked fair warning that his actions violated the detainees' constitutional right to be free from excessive force. We review de novo whether a defendant had fair warning that his conduct violated a constitutional right. *See United States v. House*, 684 F.3d 1173, 1207 (11th Cir. 2012) (reasoning that fair warning is a question of law).

Criminal liability attaches under § 242 only if case law provides the defendant "fair warning" that his actions violated constitutional rights. *United States v. Lanier*, 520 U.S. 259, 267 (1997). "[T]he standard for determining the adequacy of that warning [is] the same as the standard for determining whether a constitutional right was 'clearly established' in civil litigation under § 1983." *Hope v. Pelzer*, 536 U.S. 730, 740 (2002) (citing *Lanier*, 520 U.S. at 270–71). We conclude that case law gave Hill "fair warning" that the use of restraint chairs on compliant, nonresistant detainees inflicted excessive and thus unconstitutional force.

#### 1. Restraint chairs qualify as "force."

First, Hill argues that restraint-chair use is not "force" in the first place, so it could not have been excessive force. In support of

20                    Opinion of the Court                    23-10934

this argument, Hill analogizes restraint chairs to "passive re-straints" like handcuffs or leg shackles.  We are not persuaded.

Even if restraint chairs were "passive restraints," as Hill con-tends, we have repeatedly applied the constitutional use-of-force framework to such restraints.  For instance, in *Williams v. Burton*, 943 F.2d 1572, 1575 (11th Cir. 1991) (per curiam), we characterized the use of four-point restraints as "force."  And in *Gold v. City of Miami*, 121 F.3d 1442, 1446–47 (11th Cir. 1997), we referred to tight handcuffing for a twenty-minute period as a use of "force."  *See also Rodriguez v. Farrell*, 280 F.3d 1341, 1352 (11th Cir. 2002) (same, for "[p]ainful handcuffing").  In other words, even if a restraint is "pas-sive," that does not preclude the conclusion that it constitutes "force."

Similarly, in *Hope*, the Supreme Court noted that prior deci-sions had clearly established that "handcuffing inmates to cells or fences for long periods of time" was "punishment."  *See* 536 U.S. at 742 (quoting *Gates v. Collier*, 501 F.2d 1291, 1306 (5th Cir. 1974)).  To be sure, "punishment" is not synonymous with "force," but *Hope* demonstrates that even handcuffing may be subject to constitu-tional analysis in certain circumstances.

Instead of this binding authority, Hill relies on several un-published cases involving restraint chairs that he claims "focus on the other violence and not the chair itself as the unlawful use of

force" and therefore "support[] the inference that this Court does not classify the chair as force."[9]  We disagree.

For starters, of course, those unpublished cases are not binding on us.  *See* 11th Cir. R. 36-2.  But even if they were, they do not support Hill's inferential leap.

In none of those cases did we say that restraint-chair use was not "force."  To the contrary, in one case, we characterized the restraint and pre-restraint force "as a single excessive force claim." *Jacoby*, 755 F. App'x at 896.  Put differently, that we focused on other, more egregious displays of force does not compel the conclusion that we viewed restraint chairs as not "force."  In short, we reject Hill's argument that his restraint-chair use was not "force."

---

[9] See *Shuford v. Conway*, 666 F. App'x 811, 814, 818–19 (11th Cir. 2016) (reversing grant of qualified immunity where officers used a "Pepperball gun," Taser, and other physical force on "uncooperative" and "aggressive[]" detainees before putting them in restraint chairs); *Jacoby v. Mack*, 755 F. App'x 888, 891–92, 897 (11th Cir. 2018) (same, where officers pepper sprayed "disruptive" detainee then put him in a restraint chair without adequate decontamination for eight hours); *Coffman v. Battle*, 786 F. App'x 926, 930, 935 (11th Cir. 2019) (affirming denial of qualified immunity where officer ordered resisting detainee into a restraint chair, then tased him twice); *McNeeley v. Wilson*, 649 F. App'x 717, 720, 723 (11th Cir. 2016) (same, where officers sprayed "disobed[ient]" detainee with chemical agents and then put him in four-point restraints without a decontamination shower); *Maldonado v. Unnamed Defendant*, 648 F. App'x 939, 945, 955–56 (11th Cir. 2016) (same, where officer put prisoner, who had violated jail rules, in restraint chair and then broke his finger, kicked him, and burned him with a lighter).

### 2. *Under clearly established law, Hill's use of force was excessive.*

Next, we consider whether Hill's use of force was constitutionally excessive. We conclude that, under clearly established law at the time, it was.

For § 242 (and § 1983) purposes, "a right can be clearly established in one of three ways." *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021). Those methods include "(1) 'case law with indistinguishable facts,' (2) 'a broad statement of principle within the Constitution, statute, or case law,' or (3) 'conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.'" *Id.* (quoting *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009)). In conducting this analysis, "we look to binding decisions of the Supreme Court of the United States, this Court, and the highest court of the relevant state"—in this case, Georgia. *Glasscox v. City of Argo*, 903 F.3d 1207, 1217 (11th Cir. 2018).

Here, a "broad statement of principle," *see Crocker*, 995 F.3d at 1240, within our case law clearly established that the use of force on compliant, nonresistant detainees is excessive.[10]

As the Supreme Court has clarified, a pretrial detainee's constitutional rights are violated when "the force purposely or

---

[10] The Government also argues that the third alternative applies— that Hill's conduct was "so egregious" that no reasonable law-enforcement officer could have believed it was constitutionally permissible. *See, e.g.*, *Smith v. Mattox*, 127 F.3d 1416, 1419–20 (11th Cir. 1997). But because we decide this case based on a broad statement of principle, we need not reach that argument.

knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Force is excessive if it is "not 'rationally related to a legitimate nonpunitive governmental purpose'" or if it "appear[s] excessive in relation to that purpose." *Id.* at 398 (quoting *Bell v. Wolfish*, 441 U.S. 520, 561 (1979)).

In determining whether Hill's use of force was objectively unreasonable, we consider factors including the relationship between the need for force and the amount of force used, the extent of the detainees' injuries, any effort to temper the amount of force, the severity of the security problem, the threat reasonably perceived by the officer, and whether the detainees were actively resisting. *Id.* at 397. We also account for jail officials' "legitimate" need "to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 546–547.

With these principles in mind, we turn to their application in our precedent. To be sure, our case law has not addressed the precise factual circumstances at issue: the use of restraint chairs on compliant, nonresistant detainees. But fair warning here did not require an "extreme level of factual specificity." *See Lanier*, 520 U.S. at 268. Rather, even in the absence of "a case directly on point," our precedent leaves the unconstitutionality of Hill's conduct "beyond debate." *See White v. Pauly*, 580 U.S. 73, 79 (2017) (citation and internal quotation marks omitted).

We begin with *Hope*, the closest Supreme Court case on point. There, the Court found that prison guards who handcuffed a prisoner to a hitching post for seven hours as punishment for

"disruptive conduct" committed an "obvious" and "clear violation" of the Eighth Amendment. *Hope*, 536 U.S. at 733, 741. The Court reasoned that, although "[a]ny safety concerns had long since abated," the guards "knowingly subjected" the prisoner to "unnecessary pain" and "deprivation of bathroom breaks that created a risk of particular discomfort and humiliation." *Id.* at 738. While *Hope* arose under the Eighth Amendment,[11] it stands for the proposition that restraint, especially prolonged and painful restraint, without any legitimate penological purpose is constitutionally impermissible punishment. *See id.* at 741.

Our precedent draws an even clearer line—one that Hill's restraint-chair use crossed. As we've explained, "force in the pretrial detainee context may be defensive or preventative—but never punitive—[so] the continuing use of force is impermissible when a detainee is complying, has been forced to comply, or is clearly unable to comply." *Piazza v. Jefferson County*, 923 F.3d 947, 953 (11th Cir. 2019).

Several cases illustrate that line in practice. First, we found the use of four-point restraints permissible when a prisoner "posed a significant security concern" and the restraints inflicted "no actual

---

[11] Excessive-force cases under the Eighth Amendment consider similar factors as Fourteenth Amendment cases, so they are instructive. *See, e.g.*, *Bozeman v. Orum*, 422 F.3d 1265, 1271 (11th Cir. 2005) ("it makes no difference whether [the victim is] a pretrial detainee or a convicted prisoner because the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving . . . pretrial detainees" (citation and internal quotation marks omitted)), *abrogated on other grounds by Kingsley*, 576 U.S. 389.

injury." *Williams*, 943 F.2d at 1575. In *Williams*, the prisoner was clearly noncompliant—he committed disciplinary violations and cursed at, "threatened to kill," and spat on officers. *Id.* at 1574. Officers put the prisoner in four-point restraints for over 28 hours (except for "brief intervals for eating, physical exercise, and toilet use"), with "constant monitoring and examinations by medical personnel." *Id.* at 1574–75. We found that the officers had not violated the detainee's constitutional rights. *Id.* at 1576–77. But we cautioned that "a Fourteenth Amendment violation could occur if . . . officers continue to use force after the necessity for the coercive action has ceased." *Id.* at 1576.

A decade later, we reiterated that, in any "custodial setting," "officials may not use gratuitous force against a prisoner who has been already subdued or, as in this case, incapacitated." *Skrtich v. Thornton*, 280 F.3d 1295, 1303–04 (11th Cir. 2002), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). In *Skrtich*, the officers "used an electronic shield to shock" the prisoner, who fell to the ground, and then struck him repeatedly, ultimately slamming his head into the wall. *Id.* at 1299–1300. Even though the prisoner had a "history of disciplinary problems," we found that "no reasonable, similarly situated official" could believe such force was justified when the prisoner "had been restrained . . . and no longer posed a threat." *Id.* at 1299, 1304.

Next, in a case involving a pretrial detainee specifically, we held that "[w]hen jailers continue to use substantial force against a prisoner who has clearly stopped resisting—whether because he

26                    Opinion of the Court                    23-10934

has decided to become compliant, he has been subdued, or he is otherwise incapacitated—that use of force is excessive." *Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008), *overruled on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662 (2009). There, the detainee "had a disagreement" with jail officers and refused to obey orders, so an officer pepper sprayed him and then left him in a "small, poorly ventilated cell." *Id*. at 1303–04. That use of force, we found, was unconstitutional. *Id*. at 1310.

Most recently, we found that repeated taser use on a "motionless" and "unresponsive" pretrial detainee violated the detainee's constitutional right to be free from excessive force. *Piazza*, 923 F.3d at 950, 954. While "non-compliant, [the detainee] had neither threatened nor attempted to harm the officers," so, we reasoned, "the severity of the problem and the corresponding risk to the officers in this case were—from the very outset—exceedingly minimal." *Id*. at 954–55. Under these circumstances, taser use was objectively unreasonable. *See id*.

Hill contends that *Piazza* and its precursors do "not apply with 'obvious clarity' to cases involving passive restraint," or restraint chairs specifically. But "we have never suggested that the longstanding prohibition on a jail officer's use of force on an incapacitated detainee turns on as fine a point as the particular weapon deployed." *Id*. at 956. Indeed, in rejecting the officers' qualified-immunity arguments in *Piazza*, we said, "it is no answer to say that *Danley* involved pepper spray, *Skrtich* kicks and punches, *Williams* four-point restraints, etc.—and that none of those cases concerned

23-10934                Opinion of the Court                27

the use of a taser specifically." *Id.* In other words, case law need not confront the *type* of force at issue if it clearly establishes that *no* force would be objectively reasonable under the circumstances. *See id.*

And here, precedent clearly established that Hill could not use force against a compliant, nonresistant detainee.[12] Indeed, the relevant factors weigh against Hill here: no need for force existed, the detainees were not "actively resisting," and Hill could not have "reasonably perceived" any "threat" from the detainees' compliant behavior. *See Kingsley*, 576 U.S. at 397. Yet Hill still ordered each detainee into a restraint chair for at least four hours with his hands cuffed behind his back, without medical observation, and without bathroom (or other) breaks. Even accepting Hill's "legitimate . . . purpose" of maintaining jail security, protracted restraint-chair use was "excessive in relation to that purpose." *See id.* at 398. And contrary to Hill's contentions, four hours in a restraint chair is not "a *de minimis* level of imposition with which the Constitution is not concerned." *See Crocker*, 995 F.3d at 1251 (quoting *Bell*, 441 U.S. at 539 n.21).

_____

[12] Though it does not bear on our fair-warning inquiry, we note that several of our sister circuits have also concluded that, while restraint-chair use may be proper if a detainee is violent or noncompliant, it is impermissible once the detainee is compliant or subdued. *Compare Blackmon v. Sutton*, 734 F.3d 1237, 1242 (10th Cir. 2013) (Gorsuch, J.), *and Young v. Martin*, 801 F.3d 172, 181 (3d Cir. 2015), *with Howell v. NaphCare, Inc.*, 67 F.4th 302, 321 (6th Cir. 2023), *and Reynolds v. Wood County*, No. 22-40381, 2023 WL 3175467, at *1, 4 (5th Cir. May 1, 2023) (per curiam) (unpublished).

To be clear, we do not suggest that officers may never use "passive restraint" if the restrained individual is not actively resisting. We reiterate only the longstanding principle that force, including "passive restraint," is excessive if it is "not 'rationally related to a legitimate nonpunitive governmental purpose'" *Kingsley*, 576 U.S. at 398 (quoting *Bell*, 441 U.S. at 561). Officers sometimes have a "legitimate nonpunitive . . . purpose," *id.*, for restraining a compliant individual, such as ensuring officer safety when transporting a pretrial detainee to his arraignment. But here, Hill had no legitimate purpose for ordering compliant, nonresistant detainees who were in the secure jail environment into restraint chairs for at least four hours. Hill's use of force was therefore excessive, and our precedent gave him fair warning of that fact. *See id.*; *see also Piazza*, 923 F.3d at 953.

As a final matter, we briefly address Hill's invocation of our recent decision in *Myrick v. Fulton County*, 69 F.4th 1277 (11th Cir. 2023). Of course, that decision issued after the events here, so it does not bear on the fair-warning inquiry. But even if it did, *Myrick* is not on point.

In *Myrick*, we found that jail officers' use of restraints, including a restraint chair "to transport" a detainee, did not violate clearly established law. *Id.* at 1303–04. That detainee, who had been diagnosed with substance-induced psychotic disorder, expressed suicidal thoughts, refused to comply with officers' commands, and "charged at the officers while screaming, kicking, and punching." *Id.* at 1288–89. Officers tased and pepper-sprayed the

detainee, who continued to resist, before strapping him into a restraint chair (along with leg restraints, handcuffs, and a spit mask). *Id.* at 1289–90.

*Myrick* does not help Hill for two reasons. First, the detainee in *Myrick* was violently resisting and noncompliant, so the restraint used did not implicate the general legal principle that force used against a compliant, nonresistant detainee is excessive. Second, the officers left the detainee in the restraint chair only briefly before he became unresponsive. *Id.* at 1291. Here, by contrast, the detainees were compliant and nonresistant, yet they were left in the restraint chair for at least four hours. "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Kingsley*, 576 U.S. at 397 (quoting *Graham*, 490 U.S. at 396). Because *Myrick* is so distinguishable, it does not support the conclusion that Hill's conduct was reasonable.

In sum, we conclude that Hill had fair warning that his conduct violated the detainees' Fourteenth Amendment rights to be free from excessive force.[13] Hill's first challenge to his conviction fails.

---

[13] Hill also invokes the rule of lenity. But neither the excessive-force principle we recount above nor its application to the facts here involves any ambiguity. So there is nothing "for the rule of lenity to resolve." *See Shular v. United States*, 589 U.S. 154, 165 (2020).

*B.  The evidence sufficiently supported each element of Hill's § 242 conviction.*

Next, we consider Hill's challenges to the sufficiency of the evidence against him.  We review de novo the sufficiency of the evidence, viewing the evidence in the light most favorable to the Government and drawing all reasonable inferences and credibility choices in favor of the jury verdict.  *United States v. Wilson*, 788 F.3d 1298, 1308 (11th Cir. 2015).  We uphold a verdict "if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt."  *Id.* (citation and internal quotation marks omitted).

Hill asserts that the evidence did not sufficiently show that his conduct (1) had no legitimate nonpunitive purpose, (2) was willful, and (3) caused the detainees' injuries.  We reject all three claims.

*1.  Sufficient evidence supported a finding that Hill's conduct had no legitimate nonpunitive purpose.*

First, Hill argues that the evidence failed to sufficiently show that his restraint-chair use had no "legitimate nonpunitive . . . purpose," *see Kingsley*, 576 U.S. at 398, and was thus constitutionally excessive.  Among other purported flaws, Hill points to the Government's failure to call a law-enforcement expert to opine on whether an officer in Hill's position would believe that restraint-chair use was reasonable.

But the Government need not have presented expert testimony to establish unreasonableness.  The lay evidence at trial was

more than enough to allow a jury to reasonably conclude that Hill's conduct lacked any legitimate nonpunitive purpose and thus was constitutionally excessive.

We begin with Hill's own policy. As a reminder, that policy allowed the use of restraint chairs for "safe containment of an inmate exhibiting violent or uncontrollable behavior," but it warned that such use "never be authorized as a form of punishment." True, violation of law-enforcement "policies on the use of force [does] not by itself establish that [Hill's] actions amounted to excessive force." *United States v. Brown*, 934 F.3d 1278, 1296 (11th Cir. 2019). But the policy provided examples of legitimate nonpunitive purposes for which restraint chairs could be used and expressly prohibited their use as a punishment. So that policy is relevant, especially if the jury found that the detainees were not "exhibiting violent or uncontrollable behavior" or otherwise requiring "safe containment."

More importantly, multiple officers testified that each detainee was compliant, controllable, and non-violent before officers placed him into the chair. Yet the undisputed evidence shows that Hill ordered each detainee into the chair, anyway.

And based on the detainees' own testimony, a jury reasonably could have concluded that Hill authorized chair use *purely* as a form of punishment. For example, the jury knew about Hill's personal dispute with Howell and Hill's statements that he was "going to teach [Howell] a lesson." Similarly, the jury knew about Hill's advance decision to order Hollins into the chair without any

information about Hollins's compliance during his arrest. It also knew about Hill's choice to film a video of himself with Hollins to send to his girlfriend. And the jury heard testimony that Hill had ordered Arnold into the chair because he "got irritated personally." Plus, the jury saw a video of Hill ordering Arnold to "sit there and see if you can get some damn sense in your head." Finally, the jury heard testimony that Hill told Peterkin, "I would have riddled your ass with bullets . . . put that bitch in the chair," and told Bailey, "Oh you think you're a gangster. Put his ass in the chair." Based on this evidence, a reasonable jury could have concluded that Hill had no legitimate purpose in using the restraint chairs on the six individuals but only a punitive purpose.

What's more, Hill's argument that no expert testimony established the unreasonableness of Hill's conduct ignores that the defense itself called Deputy Chief Boehrer, the second-in-command of the Clayton County Sheriff's Department, who has worked with that department for 25 years. To be sure, neither party tendered Boehrer as an expert, but Boehrer has decades of law-enforcement experience, and both parties asked Boehrer general questions on use of force. For instance, on cross, the Government asked Boehrer about several "hypothetical" scenarios that track the facts here. And Boehrer affirmed that no policy or guideline consistent with the Constitution would permit use of a restraint chair in those circumstances without other "preattack indicators." Taken together with the other evidence we've mentioned, Boehrer's testimony also supports the jury's finding of objective unreasonableness.

In sum, the jury reasonably could have concluded that Hill had no legitimate nonpunitive purpose for ordering each detainee into a restraint chair.  And the jury was entitled to reject Hill's testimony that if a detainee "ever did anything that was violent or aggressive, when they get to the jail, even if they are behaving, [he could] then order them strapped into a restraint chair."  Indeed, "[b]ecause we recognize that the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial, our sufficiency review requires only that a guilty verdict be reasonable, not inevitable, based on the evidence presented at trial."  *United States v. Browne*, 505 F.3d 1229, 1253 (11th Cir. 2007) (citation and internal quotation marks omitted).  Here, it was.

Especially viewing the evidence in the light most favorable to the Government and drawing reasonable inferences in favor of the jury verdict, as we must, Hill's first sufficiency challenge fails. *See Wilson*, 788 F.3d at 1308.

### 2.  Sufficient evidence supported a finding that Hill acted willfully.

Hill next argues that insufficient evidence showed that he "willfully," *see* 18 U.S.C. § 242, deprived the detainees of their constitutional rights.  This challenge fares no better.

To prove willfulness, the Government must show that Hill acted "in open defiance or in reckless disregard of a constitutional requirement which ha[d] been made specific and definite." *Screws v. United States*, 325 U.S. 91, 105 (1945) (plurality opinion).  Hill "need not have been 'thinking in constitutional terms,' so long as

his 'aim was not to enforce local law but to deprive a citizen of a right and that right was protected by the Constitution.'" *Brown*, 934 F.3d at 1296 (quoting *Screws*, 325 U.S. at 106). That purpose "need not be expressed; it may be reasonably inferred from all the circumstances." *Screws*, 325 U.S. at 106.

We have reasoned that a law-enforcement officer's "training in the use of force supports the jury's finding of willfulness." *Brown*, 934 F.3d at 1296. And "where [the] officer's actions so obviously violate his training on the use of force, a jury may infer that the violation was willful." *Id.* at 1297. Such an inference may be stronger when a defendant repeatedly uses force exceeding that authorized by his training. *Cf. House*, 684 F.3d at 1202.

Here, sufficient circumstantial evidence established that Hill acted in "reckless disregard" or "open defiance" of constitutional requirements and his own policies. *See Screws*, 325 U.S. at 105. Hill testified that he had received use-of-force training and adopted use-of-force policies. Those policies defined "excessive force" as "any force used in excess of the amount of force reasonably required to establish control over or to prevent or terminate an unlawful act of violence."

As we've discussed, the jury reasonably could have concluded that restraint-chair use was not "reasonably required to establish control over" compliant, nonresistant detainees. Indeed, the jury reasonably could have found that Hill ordered the detainees into restraint chairs solely to punish them. And if it did, that conduct "so obviously violate[d]" Hill's training and clearly

established law—namely, that force can never be used to punish pretrial detainees—that the jury reasonably could have "infer[red] that the violation was willful." *See Brown*, 934 F.3d at 1297. Based on this record, we reject Hill's argument that the jury needed expert testimony to draw that an inference.

So viewing the evidence in the light most favorable to the Government and drawing reasonable inferences in favor of the jury verdict, Hill's second sufficiency challenge fails. *See Wilson*, 788 F.3d at 1308.

### 3. Sufficient evidence supported a finding that Hill's use of force caused the detainees' injuries.

Finally, Hill argues that, in three ways, the evidence failed to sufficiently show that his conduct caused the detainees' injuries. First, he says that he neither ordered nor foresaw that jail staff would ignore policy that forbade leaving detainees handcuffed and without medical attention. Second, Hill theorizes that the detainees' injuries could have resulted from being handcuffed before arriving at the jail. Third, he asserts that "discomfort from sitting in a chair for four hours . . . hardly rises to the level of physical pain that would support a felony conviction." Again, we conclude that Hill's arguments lack merit.

For a § 242 conviction, "bodily injury" includes "(A) a cut, abrasion, bruise, burn, or disfigurement; (B) physical pain; (C) illness; (D) impairment of a function of a bodily member, organ, or mental faculty; or (E) any other injury to the body, no matter how

temporary." *United States v. Myers*, 972 F.2d 1566, 1572–73 (11th Cir. 1992) (citations and internal quotation marks omitted).

Setting aside Hill's specific arguments, the detainees' testimony and photographs admitted into evidence satisfy this definition. All detainees testified that they experienced serious physical pain while in the restraint chair. Under our definition, that is enough. But the Government also introduced photographic evidence of the detainees' injuries: the lasting scars on Peterkin's wrists and Howell's wrists, as well as the "open and bleeding" wounds on Bailey's wrists. These marks qualify as "cut[s]" or "other injur[ies] to the body." *See id.* Howell also testified that he continues to suffer neck, back, arm, leg, and toe pain and numbness from a pinched nerve. So the record evidence easily allowed a reasonable jury to find that the detainees suffered "bodily injury" and that hours in the restraint chair on Hill's orders caused that injury.

Next, we turn to Hill's three sub-arguments. First, sufficient circumstantial evidence allowed the jury to reasonably conclude that Hill foresaw that jail officials would not adhere to the restraint-chair policy. Hill visited detainees, including Hollins, while they were in the chair and saw them handcuffed with their hands behind their back. Hill was also present when officers placed a handcuffed Howell in the chair. On cross, Hill acknowledged that he did not order the handcuffs removed. Because Hill had seen multiple detainees handcuffed while in the restraint chair, a jury could reasonably infer that Hill foresaw and knew that jail officials would not follow policy directives to remove handcuffs. On top of that,

though the policy allowed for chair restraint *up to* four hours, multiple officers testified that Hill ordered detainees into restraint chairs for *at least* four hours. So a jury could reasonably infer that Hill foresaw that a detainee would remain handcuffed in the chair for four or more hours at a time, which could lead to physical pain and injury.

Second, while it is theoretically possible that the detainees could have sustained wrist injuries from too-tight handcuffs before arriving at the jail, testimony from multiple detainees rebukes that theory. Bailey expressly testified that his wrist cuts were from his time in the chair, not handcuffs during his arrest. Other detainees testified similarly. So a jury reasonably could have found that the detainees' time in the chair—not their prior handcuffing—caused their injuries.

Third, the evidence rebuffs Hill's claim that the restrained detainees experienced mere "discomfort." For example, Hollins testified that the pain was "like torture," and Peterkin called it "the worst thing [he] ever felt." The detainees also testified to the pain of having to hold their urine and ultimately urinate on themselves. *Cf. Hope*, 536 U.S. at 738 (noting the "risk of particular discomfort and humiliation" from denial of bathroom breaks). The jury reasonably could have accepted these detainees' testimony about the pain they experienced and rejected Hill's dismissal of it as mere "discomfort."

Viewing the evidence in the light most favorable to the Government and drawing reasonable inferences in favor of the jury

verdict, Hill's third sufficiency challenge fails.  *See Wilson*, 788 F.3d at 1308.

### C. *The district court acted within its discretion in questioning jurors and giving two* Allen *charges.*

Finally, Hill challenges the district court's juror questioning and *Allen* charges during jury deliberations.  We review a district court's investigation of alleged juror misconduct during deliberations for abuse of discretion.  *United States v. Polar*, 369 F.3d 1248, 1253 (11th Cir. 2004).  We also review a district court's *Allen* charge for abuse of discretion.  *See United States v. Woodard*, 531 F.3d 1352, 1364 (11th Cir. 2008).  But when a defendant does not object to the contents of that charge, we review for plain error.  *See United States v. Anderson*, 1 F.4th 1244, 1268 (11th Cir. 2021).

Here, we find no merit to the challenge.  The district court found itself in a difficult position, and we conclude that it acted within the limits of its discretion.

### 1. *The district court did not abuse its discretion in investigating alleged juror misconduct.*

First, the district court acted within its discretion in questioning the jury foreperson and Juror 6 twice each.  The court received multiple reports that Juror 6 refused to follow the law, including an allegation that Juror 6 "stated that the Sheriff [and] the President are above the law and not required to follow the Constitution."  And several jury notes claimed that Juror 6 could not or would not engage in deliberation.  The foreperson corroborated

these allegations when called before the court. So the district court had cause for concern.

When faced with allegations of juror misconduct, a district court has "broad" investigatory discretion. *United States v. Yonn*, 702 F.2d 1341, 1344–45 (11th Cir. 1983), *cert. denied*, 464 U.S. 917 (1983). Among other courses of proceeding, juror questioning may be "necessary so as to avoid premature or unjustified dismissal" of a juror. *Polar*, 369 F.3d at 1253. Indeed, a "district court is uniquely situated to make the credibility determinations" related to "a juror's motivations and intentions" before taking such action as dismissing the juror or declaring a mistrial. *United States v. Abbell*, 271 F.3d 1286, 1302 (11th Cir. 2001), *cert. denied*, 537 U.S. 813 (2002).

We have repeatedly found no abuse of discretion on facts similar to those here. In *Polar*, for example, we held that the district court did not abuse its discretion in questioning the foreperson and another juror after it received notes that the juror "wishe[d] to abstain" from a verdict, "refused to vote," and "indicated a mistrust of and bias against the government and the criminal justice system." 369 F.3d at 1251, 1254. We rejected the defendant's argument that such questioning was "inherently coercive." *Id.* at 1254; *see also United States v. Augustin*, 661 F.3d 1105, 1133 (11th Cir. 2011) (finding no abuse of discretion where, after several complaints from jurors, the court asked a juror "only general questions that provided [her] with a sufficient opportunity to repeat or elaborate on the allegation[s]"); *Yonn*, 702 F.2d at 1344–46 (same, where district court interviewed each juror individually after one juror had

improperly expressed her opinion on the evidence before deliberations).

In fact, we have upheld juror *dismissals* on facts similar to those here. For instance, in *Abbell*, we found no abuse of discretion when the district court interviewed each juror and then dismissed a juror who allegedly said she was not going to follow the law and that the court's instructions were only advisory. *See Abbell*, 271 F.3d at 1303–04; *see also United States v. Godwin*, 765 F.3d 1306, 1315, 1319 (11th Cir. 2014) (same, after other jurors complained that the juror "simply disagree[d] with what the law is" and was following his own opinion "over the rules"). Of course, the district court did not dismiss Juror 6, so we express no opinion on whether it had sufficient cause to do so. But this precedent further favors the conclusion that the district court did not abuse its discretion.

The district court acted consistently with our precedent's directives. The court assured Juror 6 that he was "not in trouble." *See Yonn*, 702 F.2d at 1345. And rather than confronting Juror 6 with the specific allegations, the court asked him "only general questions" like whether he was engaging in deliberations and following the court's instructions. *See Augustin*, 661 F.3d at 1133. Our case law does not require a district court to declare a mistrial at the first sign of jury conflict. *Cf. United States v. Davis*, 779 F.3d 1305, 1314 (11th Cir. 2015) ("declaring a mistrial can impose a cost not just in time and resources but in the quality of justice . . . [s]o it is best not to declare a mistrial too soon"). Nor does it require a district court to sit back and do nothing in the face of "specific, consistent, and

23-10934                Opinion of the Court                41

credible" evidence that a juror is not engaging in deliberations or following the law.  *See Godwin*, 765 F.3d at 1318.

To be sure, it was unusual for the district court to ask Juror 6 essentially the same questions twice, including once after the court gave the reconstituted jury an *Allen* charge.[14]  But none of the district court's questions were coercive—even Hill does not argue that they were.  And the court expressly told Juror 6 not to "go too far in[to] what [the jury] discussed."  Nor was the questioning in and of itself coercive.  Though unusual for good reason, we cannot conclude on this record that the district court's conduct constituted an abuse of discretion.

So we conclude that, especially in the interest of avoiding either a mistrial or a juror dismissal, the district court did not abuse its discretion in investigating the claims against Juror 6.  *See Yonn*, 702 F.2d at 1344.

### 2.  *The district court did not abuse its discretion in giving two* Allen *charges.*

Second, the district court acted within its discretion when giving both *Allen* charges.  Like Hill, we focus on the second *Allen* charge.  And for the sake of argument, we adopt Hill's characterization of the *Allen* charges as "successive," though technically the reconstituted jury received only one *Allen* charge.  Again, the district court told the jury to "start its deliberations anew," and we

---

[14] As we discuss below, this was the reconstituted jury's first *Allen* charge, not, as Hill contends, simply a second *Allen* charge.

have no reason to believe the jury did not follow that instruction. To the contrary, "[w]e have obediently followed and repeated the Supreme Court's direction that we presume juries follow their instructions." *United States v. Roy*, 855 F.3d 1133, 1186–87 (11th Cir. 2017) (en banc).

A district court has "broad discretion" with respect to *Allen* charges "but must not coerce any juror to give up an honest belief." *Davis*, 779 F.3d at 1312. We will conclude that "a district court has abused its discretion in giving a modified *Allen* charge only if the charge was inherently coercive." *Woodard*, 531 F.3d at 1364. To determine coerciveness, "we consider the language of the charge and the totality of the circumstances under which it was delivered." *Id*. And we have "never adopted a *per se* rule against successive *Allen* charges;" rather, "what counts is not the number of instructions but the overall circumstances and risk of coercion." *Davis*, 779 F.3d at 1313.

At the outset, any challenge to the language of the *Allen* charge fails, as we have "approved" the Eleventh Circuit pattern *Allen* instruction, including with "minor wording changes," "on numerous occasions." *Anderson*, 1 F.4th at 1269, 1271 (quoting *United States v. Bush*, 727 F.3d 1308, 1320 (11th Cir. 2013)).

Hill must rely, then, on the totality of the circumstances. The relevant circumstances include (1) the length of the deliberations; (2) the number of times the jury reported being deadlocked; (3) whether the court was aware of the numerical split when it instructed the jury to continue deliberating; and (4) the time between

23-10934                Opinion of the Court                43

the court's final instruction and the jury's verdict. *Brewster v. Hetzel*, 913 F.3d 1042, 1053 (11th Cir. 2019).[15]  We discuss each below.

As to the length of the deliberations, we begin by clarifying how long that period lasted.  Hill contends that the jury deliberated for four days.  But that collapses the original and reconstituted juries.  The original jury deliberated for roughly a day and a half, while the reconstituted jury deliberated for two days.

Hill is right that the "[t]he risk of coercion increases as deliberations run longer." *Davis*, 779 F.3d at 1314.  And a two-day period is considerably longer than other cases in which we have found *Allen* charges to not be coercive.  *See, e.g.*, *Anderson*, 1 F.4th at 1252 (three-and-a-half hours); *Bush*, 727 F.3d at 1317–1319 (roughly five hours); *Davis*, 779 F.3d at 1312 ("just over six hours"); *Woodard*, 531 F.3d at 1359–60 (seven hours).  But this factor, standing alone, does not render the district court's second *Allen* charge coercive.  *See Brewster*, 913 F.3d at 1053 ("eleven hours over two days . . . is not an inordinate amount of time").

Next, we turn to the number of deadlock reports.  The reconstituted jury never reported that it was deadlocked, hopelessly or otherwise.  To be sure, before one juror was replaced, the

---

[15] We note *Brewster*'s distinct procedural posture, as we applied de novo review to the district court's denial of the defendant's 28 U.S.C. § 2254 habeas petition.  913 F.3d at 1053.  Here, by contrast, we review for abuse of discretion.  *See Woodard*, 531 F.3d at 1364.  That said, because Hill relies heavily on *Brewster* and because we find its articulation of the relevant factors useful, we work within that portion of its framework here.

original jury reported that it had "agreed on [two] counts" but was "deadlocked" on the other five. And later, the reconstituted jury sent a note stating that it was "unable to reach a unanimous decision **today**" (emphasis added). But at no time did the reconstituted jury say it could not reach a verdict *at all*. To the contrary, when the court asked whether the jury was hopelessly deadlocked, the foreperson responded, "I would not like to make that determination right at this moment. . . . With further deliberations, it may be we can get somewhere."

We have found no coercion even when the jury *did* report deadlock. *See Anderson*, 1 F.4th at 1252 (jury sent a note stating that it could not reach a verdict); *Davis*, 779 F.3d at 1312 (jury reported deadlock before and after *Allen* charge); *Woodard*, 531 F.3d at 1359 (jury declared that it was "hung" and "[would] not come to a unanimous decision"); *but see Brewster*, 913 F.3d at 1047–48 (finding coercion where jurors sent six notes "stating that they could not reach a verdict," including one expressing "no possibility of resolve"). This factor, then, does not support finding that the *Allen* charge was coercive.

Turning to the jurors' numerical split, we find that the record doesn't show that the court knew this information before it gave the *Allen* charge. In fact, during the court's second questioning of the foreperson, the court directed her not to share "the numerical breakdown" of the jurors' votes. To be sure, the district court knew that Juror 6 was the subject of the jury's notes and foreperson's concerns, but it did not know (nor do we) that Juror 6 was

23-10934                Opinion of the Court                45

the sole "holdout" juror on all (or any particular) counts. Indeed, the jury returned a not-guilty verdict on the count involving Harper. And we have no information about whether any of the other jurors, at any point in the deliberations, leaned towards a not-guilty verdict on any of the other counts. In any case, the record here doesn't provide a sufficient basis to conclude that this factor favors a finding of coercion. *See Lowenfield v. Phelps*, 484 U.S. 231, 234–35, 241 (1988) (finding no coercion when trial court polled the jurors as to whether "further deliberations [would] enable [them] to arrive at a verdict," effectively revealing an 11-to-1 split, and then gave a supplemental instruction); *but see Brewster*, 913 F.3d at 1047 (finding coercion where the jury revealed an 11-to-1 split twice).

Finally, we consider the time between the court's final instruction and the jury's verdict. The jury deliberated for nearly three hours after the second *Allen* charge before it reached its verdict. We have repeatedly found no coercion even with shorter periods between charge and verdict. *See Davis*, 779 F.3d at 1313 (just over two hours); *Anderson*, 1 F.4th at 1271 (an hour and a half); *United States v. Rey*, 811 F.2d 1453, 1458–60 (11th Cir. 1987) (same); *United States v. Bailey*, 468 F.2d 652, 664 (5th Cir. 1972) (same), *aff'd en banc*, 480 F.2d 518 (5th Cir. 1973);[16] *Bush*, 727 F.3d at 1319 (47 minutes); *United States v. Scruggs*, 583 F.2d 238, 239–41 (5th Cir. 1978) (48 minutes, at nearly 11:30 p.m.); *but see Brewster*, 913 F.3d at

---

[16] All Fifth Circuit decisions issued before October 1, 1981, are binding precedent in this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

1056 (finding coercion when "only 34 minutes" elapsed between the final charge and verdict). This substantial three-hour period contradicts any suggestion that a holdout juror was "forced to roll over without engaging in further conscientious deliberation." *See Anderson*, 1 F.4th at 1271.

The other circumstances here likewise fail to indicate coercion. So we conclude that the district court did not abuse its discretion in giving two *Allen* charges.

### 3. The district court's inadvertent omission of "not" in the Allen charge was harmless.

Finally, we address Hill's claim that the misread *Allen* charge was itself coercive. As we've explained, the transcript indicates that the district court misstated the law when it instructed the jury that "if the evidence fails to establish guilt beyond a reasonable doubt, the defendant must have your unanimous verdict of guilty." It should have said "not guilty." But on this record, that error does not entitle Hill to relief.

Because Hill failed to object to the contents of the *Allen* charge (either as written or read), we review for plain error. *See Anderson*, 1 F.4th at 1268. On plain-error review, Hill must prove that (1) error occurred, (2) that error was plain, and (3) it affected Hill's substantial rights. *United States v. Malone*, 51 F.4th 1311, 1319 (11th Cir. 2022). Only if Hill can satisfy all three prongs do we then have discretion to correct the error if it "(4) seriously affected the fairness of the judicial proceedings." *Id.*

23-10934                Opinion of the Court                47

Hill can satisfy the first and second prongs here, but not the third. As to the third, an error affects a defendant's substantial rights if it "affect[s] the outcome of the district court proceedings." *Id.* (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)). Here, we know that the omission of "not" did not lead the jury to convict Hill when it would have otherwise acquitted because the jury, in fact, acquitted Hill of the count relating to Harper.

But on top of that, the weight of the evidence here, as we've already discussed, was substantial, and the court's other correct instructions made it clear to the jury that it must find Hill not guilty if it concluded that the evidence failed to establish guilt beyond a reasonable doubt. In this respect, the district court had already given an *Allen* charge and correctly read the phrase "not guilty." And the court's legal instructions at the beginning and end of the trial, which the jury took into the deliberation room, recited the correct legal standard.

At bottom, then, the court's plain error in leaving out the word "not" did not "affect[] the outcome" of Hill's trial. *See id.*; *cf. also United States v. Gold*, 743 F.2d 800, 822 (11th Cir. 1984) (holding that an "inadvertent[]" addition of "not," especially "in the context of the charge as a whole," was "clearly harmless beyond a reasonable doubt"); *United States v. Mills*, 704 F.2d 1553, 1558 (11th Cir. 1983) (finding no prejudice from a "single slip of the tongue by the trial judge" where the record was otherwise "replete" with correct instructions on the burden of proof).

Since Hill cannot satisfy the third requirement, we do not get to the fourth prong of plain-error review. *See Malone*, 51 F.4th at 1319. And Hill's challenge to the district court's second *Allen* charge fails.

### III.    CONCLUSION

For the reasons we've discussed, Hill had fair warning that his conduct was unconstitutional, the evidence was sufficient to convict, and the district court did not coerce the verdict. We affirm Hill's conviction on all counts.

**AFFIRMED.**

23-10934                MARCUS, J., Concurring                 1

MARCUS, Circuit Judge, Concurring:

I concur fully in the Court's opinion. I have no doubt Sheriff Hill had fair warning that he violated the constitutional rights of six detainees when he ordered them strapped into a painful restraint chair for four or more hours for no legitimate reason associated with maintaining safety and good order in a county jail. I also agree that the evidence was more than sufficient to sustain the jury's verdicts. And I am satisfied that the district court judge acted within her considerable discretion when she questioned Juror 6 two times during the course of the jury's deliberations. I write separately, however, to highlight the substantial dangers inherent in singling out a juror for judicial inquiry, particularly doing so twice within a relatively short time frame.

Dealing with allegations of juror misconduct is an extraordinarily difficult and dangerous undertaking for any trial judge. A defendant's right to a trial by an impartial jury is a "fundamental reservation of power in our constitutional structure." *United States v. Brown*, 996 F.3d 1171, 1183 (11th Cir. 2021) (en banc) (quoting *Blakely v. Washington*, 542 U.S. 296, 306 (2004)); *see* U.S. CONST. amend. VI. So, when there are allegations that a juror cannot be impartial, or that he refuses to follow the court's instructions, or that he refuses to deliberate with the other members of the jury, or, perhaps, that he has considered extrinsic evidence beyond the trial record, a district judge must take these claims seriously. *See United States v. Caldwell*, 776 F.2d 989, 998 (11th Cir. 1985) ("The more serious the potential jury contamination, . . . the heavier the

burden to investigate."); *United States v. Harris*, 908 F.2d 728, 734 (11th Cir. 1990) (same); *United States v. Bradley*, 644 F.3d 1213, 1278–79 (11th Cir. 2011) (noting that "we would expect the district court to take . . . measures in investigating the potential prejudice to the defendants" where there were "troubling" allegations that two jurors had prejudged the defendants' guilt). We have sustained the power of the trial judge to investigate allegations of misconduct by questioning jurors precisely in order to "avoid premature or unjustified dismissal." *United States v. Polar*, 369 F.3d 1248, 1253 (11th Cir. 2004). But in investigating misconduct, the judge must tread very carefully in order to respect the secrecy of the jury's deliberative process and to avoid coercing a juror who may be at odds with the others into giving up his honestly held beliefs or for the sake of conforming to the majority. *See Brown*, 996 F.3d at 1186.

It should go without saying that district court judges are best placed to handle allegations of juror misconduct because they "deal with jurors on a regular basis, and . . . are in the trenches when problems arise." *United States v. Dominguez*, 226 F.3d 1235, 1246 (11th Cir. 2000). They are therefore particularly well "situated to make the credibility determinations that must be made" when faced with an allegation of juror misconduct. *United States v. Abbell*, 271 F.3d 1286, 1303 (11th Cir. 2001); *cf. Owens v. Wainwright*, 698 F.2d 1111, 1113 (11th Cir. 1983) ("Appellate courts reviewing a cold record give particular deference to credibility determinations of a fact-finder who had the opportunity to see live testimony."). For this reason, the trial judge has broad discretion in how to handle such allegations. *See Dominguez*, 226 F.3d at 1247. The applicable

abuse-of-discretion standard means that "there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call." *Id.* (quoting *In re Rasbury*, 24 F.3d 159, 168 (11th Cir. 1994)). "The whole point of discretion is that there is [a] range of options open, which means more than one choice is permissible." *Id.* We will defer to the district court's superior ability to handle these issues unless we find their choice reflects a clear error of judgment. *See McMahan v. Toto*, 256 F.3d 1120, 1128 (11th Cir. 2001).

The district judge in this case was faced with a particularly difficult judgment call. During the deliberative process, she had received a note from the foreperson of the jury complaining that Juror 6 was incompetent, that he would not engage in deliberations with the others, and that he would not follow the court's instructions on the law. The trial judge questioned him to discern whether these allegations were true in whole or in part, and did so faithfully following our precedent. *See Abbell*, 271 F.3d at 1304 n.20 (recognizing that a judge may question jurors "to detect and rectify" misconduct). The problem, however, was compounded the next day when the judge received two more notes signed by the foreperson, again complaining that Juror 6 was incompetent and that he would not follow the judge's instructions.

The universe of options the district judge faced were limited. She had four choices; none was ideal. First, she could have declared a mistrial -- the most extreme option -- but understandably decided that that would be premature, since the reconstituted jury

had only deliberated for a day and a half. (The trial had lasted eight days.) Second, she could have dismissed Juror 6 and replaced him with an alternate -- but a judge can dismiss a juror only if she is sure there is "no substantial possibility" that he will deliberate according to instructions, and the juror's notes, standing alone, almost surely did not meet this high standard. *See id.* at 1304. Third, she could have done nothing. This, too, was an unenviable choice because the district judge was faced with renewed allegations of serious misconduct that, if substantiated, would likely have warranted dismissal. *See id.* (affirming dismissal of a juror who indicated she would not follow the court's instructions). Finally, the district court judge could have brought Juror 6 in again, as she did, for additional questioning in order to inform her decision about the appropriate course of conduct.

Faced with these unenviable choices, the judge's decision to question Juror 6 again was not an abuse of discretion. A district court judge could well have thought that it was too early to declare a mistrial and that the dismissal of Juror 6 based solely on the allegations of his fellow jurors was reversible error. *See Brown*, 996 F.3d at 1175. So, the judge had two real options: do nothing or carefully question the juror again. "[O]ur jury system works only when both the judge and the jury respect the limits of their authority," and a juror who refuses to follow the court's instructions "abdicates his constitutional responsibility and violates his solemn oath." *Id.* at 1184 (quotation marks and citations omitted). The allegations of misconduct were repeated and they were serious. The greatest concern was the claim that Juror 6 had told the other jurors he did

not agree with the law and "w[ould] not consider it." Indeed, before Juror 6 was questioned the first time, the most serious allegation of misconduct was that he told the other jurors that "the sheriff [and] the president are above the law and not required to follow the constitution." Thus, the trial judge was understandably reluctant to allow Juror 6 to continue deliberating without checking whether the juror actually refused to follow her instructions on the law. Although Juror 6 had said he was trying to follow the court's instructions when the judge first questioned him, the judge acted within her broad discretion to follow up on the repeated assertions from the foreperson.

And when the judge did question Juror 6 on each occasion, she did so with care and tact, doing her best not to penetrate the jury's deliberative process, and asking Juror 6 only general questions that did not suggest he had done anything wrong. *See United States v. Yonn*, 702 F.2d 1341, 1345 (11th Cir. 1983) ("[T]he record reveals the commendable caution exercised by the trial judge in questioning each juror."). Under these circumstances, and done with such care, the judge did not abuse her discretion.

The hard fact of life, however, is that questioning a juror always comes with risk. *See United States v. Thomas*, 116 F.3d 606, 620 (2d Cir. 1997) ("[T]he very act of judicial investigation can at times be expected to foment discord among jurors."). The more often you do it, the greater the danger. Among other things, the judge risks revealing information about the nature and extent of the jury's deliberations, which must remain secret to promote the

6                    MARCUS, J., Concurring                    23-10934

jury's ability to debate freely, robustly, and fully. *See United States v. Symington*, 195 F.3d 1080, 1086 (9th Cir. 1999); *see also Clark v. United States*, 289 U.S. 1, 13 (1933) ("Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world."). The trial judge also runs the risk of influencing the jury simply by singling out one of its members for separate inquiry. *See Symington*, 195 F.3d at 1086. No matter how careful a judge is, a questioned juror often will veer into a discussion about the jury's deliberations -- as the judge discovered in this case when Juror 6 revealed that the jury's dispute centered on the meaning of specific intent and willfulness.[1]

Perhaps even more serious is the risk that, in questioning a juror, the court will inadvertently pressure a dissenting juror into giving up his honestly held beliefs. When one juror disagrees with the majority, there is always the danger that the majority will

---

[1] In the judge's first inquiry of Juror 6, the following colloquy occurred:

> [Juror 6]: -- If I may also add?
>
> The Court: Yes, sir.
>
> [Juror 6]: I -- I have annoyed people by going to specific paragraphs of the document that you gave us, and the specifics of this case, and under three different passages that related to intent and willful where you're defining the terms and then --
>
> The Court: Okay.
>
> [Juror 6]: And I --
>
> The Court: I don't want to go too far in what you discussed.

23-10934                 Marcus, J., Concurring                 7

mistakenly brand the dissenter incompetent or biased, when he is in fact simply harboring a reasonable doubt. *See Abbell*, 271 F.3d at 1302; *Thomas*, 116 F.3d at 622. To dissent in the face of universal opposition often requires courage. *See United States v. Rey*, 811 F.2d 1453, 1460 (11th Cir. 1987) ("In some cases, the duty of a juror is rigorous. Deliberations can be long, hard and heated. It is each juror's duty to stand by his honestly held views; this can require courage and stamina."). A dissenting juror is already under considerable pressure to fold, and the judge must take care not to add to that mix. "The last thing such a minority holdout juror needs is for the trial judge -- cloaked with the full authority of [her] office -- to even hint that" the juror should "just reconsider." *Id*. A central feature of our criminal justice system and an important safeguard of liberty is the right to be free unless convicted by a unanimous jury. *See Brown*, 996 F.3d at 1182–83; *see also Rey*, 811 F.2d at 1460 ("One of the safeguards against the conviction of innocent persons built into our criminal justice system is that a jury may not be able to reach a unanimous verdict.").

Questioning a juror once is risky enough; questioning the same juror twice is downright dangerous. The risks inherent in this kind of judicial inquiry are amplified each time the juror is questioned. And, where the allegations of misconduct have not changed, there may be diminishing returns in bringing the juror out again -- after all, the judge has already had the opportunity to probe the allegations and decide if they are substantiated. Because the standard for dismissing a juror is so high, limited questioning and contextual clues will usually suffice to tell a judge that the

standard for dismissal has not been met. *See Brown*, 996 F.3d at 1186 ("'A presiding judge faced with anything but unambiguous evidence that a juror [is engaging in misconduct] need go no further in [her] investigation' of the alleged misconduct." (quoting *Thomas*, 116 F.3d at 622)).

Because "the twin imperatives of preserving jury secrecy and safeguarding the defendant's right to a unanimous verdict from an impartial jury" are so important, *id.* (quoting *Symington*, 195 F.3d at 1087), sometimes it may be wiser for a judge not to question the juror. *See Symington*, 195 F.3d at 1086 (accepting that, "[i]n refraining from exposing the content of jury deliberations, . . . a trial judge may not be able to determine conclusively" whether allegations of juror misconduct are legitimate); *see also Brown*, 996 F.3d at 1195 (Brasher, J., concurring) ("When disputes arise between jurors, the default response should be deliberation, not investigation."). Sometimes, it may be wiser to "err on the side of too little inquiry as opposed to too much." *See Abbell*, 271 F.3d at 1304 n.20.

Put simply, questioning a juror repeatedly is not a path that should be taken lightly or without meticulous care. The terrain is dangerous and the traveler must proceed with great caution.